In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3764

United States of America,

Plaintiff-Appellee,

v.

Kenneth M. Senffner,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 490--George W. Lindberg, Judge.

Argued March 27, 2001--Decided February 6, 2002

   Before Posner, Manion, and Williams,
Circuit Judges.

   Williams, Circuit Judge. Kenneth Senffner
was convicted of contempt of court,
obstruction of justice, and obstruction
of a proceeding pending before the SEC,
based on his actions in an investment
fraud scheme. He appeals, challenging the
sufficiency of the evidence to support
his conviction for obstruction of an SEC
proceeding, and the district court's
admission of his prior civil contempt and
other conduct not charged in the
indictment in evidence. We believe the
evidence was sufficient to sustain
conviction and that the district court
properly admitted the challenged evidence
at trial. Therefore, we affirm.

I.  BACKGROUND

   The saga of Senffner's wheeling and
dealing began in 1991. That year John
Lauer was hired by the CHA as its
employee benefits manager. One of his
early tasks was to find insurance for CHA
tenants who worked tenant patrol. Capital
American, represented by Senffner,
answered the call. In making an offer to
provide insurance, Senffner sweetened the
deal by agreeing to cut Lauer in on his
sales commission. But, Lauer did not tell
the CHA about the commission agreement
when he presented Senffner's offer.

The next year, Lauer was assigned the task of reviewing the CHA's employee health benefits insurance rolls and updating the CHA's record-keeping. Lauer talked with Senffner about the assignment, and Senffner had just the fix. He had a company, called Midwest Medcost, that performed those services, and with another illegal kickback, Lauer sealed the deal with the CHA (again not telling the CHA of the kickback). The CHA then paid $2.4 million to Midwest Medcost for past-due premiums.

Then, the real games began. Lauer knew the CHA was perpetually late in making its insurance payments and that the insurers accepted this practice. With this window (one they were supposed to close), Senffner and Lauer used the money to make short-term investments for themselves. They invested $420,000 in four high-interest CDs with Canadian Trade Bank, a company for whom Senffner was also a sales agent. Both Senffner and Lauer received sales commissions. Unfortunately, the risk, but not the returns, materialized. To make matters worse, Michael Randy, an officer of the company, was arrested and ultimately convicted of racketeering and mail fraud. At the time of his arrest, Randy had Senffner collect the CDs from Lauer and give them to his (Randy's) wife, who promptly reissued them in Lauer's name.

Following this exchange, Senffner was questioned by a Postal Inspector conducting a criminal investigation into Randy and his company. Senffner and Lauer had earlier agreed to conceal their illegal activities if ever questioned. So Senffner lied. He told the inspector and testified at Randy's criminal trial in federal court that he had only sold CDs to Lauer and Alan Hilberg. For the $420,000 of CHA money they invested, Senffner and Lauer got back $22,000. And, to get that amount they submitted false CD certificates in Randy's bankruptcy proceeding.

Later that year, the CHA wanted to create an early retirement program that included a supplemental incentive check and supplemental medical coverage, but the CHA's pension fund provider could not make the extra allowances. Senffner and Lauer had a solution. They created CCI, a

limited partnership with no capitalization. The CHA deposited $4.7 million into two accounts, one for supplemental incentives and the other for supplemental medical insurance. Senffner and Lauer controlled the accounts, from which they took $3 million (and later another $200,000) and invested in Legacy Trust. Just like the Canadian Trade Bank debacle, Senffner and Lauer served as sales agents for Legacy Trust and collected commissions on the sale. But Legacy Trust was not reputable either because it was investing in illegal bank instruments. This investment tanked, and Senffner and Lauer lost everything.

In March 1993, Senffner and Lauer made another improper investment in Konex, using $10 million of CHA pension fund money. They had access to this money because Lauer had been promoted to CHA director of benefits and risk management. Initially, they received no commission, but Senffner and Lauer arranged to receive a commission on any trades Konex made with the money. A short time later, they added another $2.5 million to the investment, this time with CHA pension money and CHA money from the CCI and Medcost accounts. Predictably, they lost it all. Konex traded in the same illegal bank investments as Legacy Trust.

Finally, the SEC stepped in to stop these investment schemes. And, on June 21, 1994, the SEC filed a lawsuit seeking civil penalties and interest; a temporary and permanent injunction restraining CCI and Konex from any further securities violations; and a freeze of assets. The district court issued a temporary restraining order ("TRO"), freezing CCI's assets.

Around the same time, the Tennessee Department of Commerce sued Legacy Trust for illegal securities transactions and had the trust assets placed in receivership for the benefit of the victims. The largest victim was CCI, who had lost $3.2 million. On July 5, 1994, the Tennessee Receiver's Office sent a check to CCI for $373,714.91, representing what remained of CCI's loss. Lauer turned the check over to the CHA, but Senffner had the Tennessee Receiver put a stop-payment order on the check and issue a second check to him. Senffner assigned this check to his attorney Glenn

Palmer to deposit into his attorney escrow account.

These funds were subject to the TRO that arose out of the SEC lawsuit against CCI. After Lauer discussed the stop-payment order with Senffner, Senffner told him that he intended to make a quick investment, before returning the money, and he asked Lauer to stall. When the SEC discovered Senffner's transfer, they demanded its return, which he eventually returned, pursuant to a civil contempt order issued by the district court. Later, Senffner was charged with contempt of court under 18 U.S.C. sec. 401(3), obstruction of justice (in relation to the SEC lawsuit) under 18 U.S.C. sec. 1503, and obstruction of a proceeding pending before the SEC under 18 U.S.C. sec. 1505. In Senffner's criminal prosecution, the government offered evidence of Senffner's conduct, and the jury convicted him on all three counts. Senffner appeals.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

We begin our analysis with the statute involved. When an individual "corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States," there is a violation of 18 U.S.C. sec. 1505. Senffner asserts that the evidence was insufficient to sustain his conviction under this statute, arguing that the evidence does not show that he in fact obstructed an SEC proceeding or that he "endeavored" to obstruct an SEC proceeding. We reject both arguments.

In rejecting these arguments, we are mindful of several standards that apply to our analysis. We must consider the evidence in the light most favorable to the government, drawing all reasonable, justifiable inferences in its favor. In connection with that obligation, we will not reweigh the evidence, nor second-guess the jury's credibility determinations. Only when the record contains no evidence from which the jury could find guilt beyond a reasonable

doubt, will we overturn the verdict. United States v. Masten, 170 F.3d 790, 794 (7th Cir. 1999); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979) (stating the question as whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original)).

1. SEC proceeding.

Senffner argues that the evidence was insufficient to convict him of obstruction of a proceeding pending before the SEC, because the SEC had no independent authority to freeze or distribute assets, or to impose civil penalties, but needed to obtain an order from the federal district court. He argues that he only obstructed the district court, not the SEC. His argument is without merit; he obstructed both.

The SEC, as a government agency, can only act through individuals or other instrumentalities using the enforcement mechanisms it has available. These mechanisms may be internal or involve other entities, including the federal courts. Therefore, whenever an entity acting for or at the direct request of an agency has been obstructed, the agency itself has also been obstructed. See, e.g., United States v. Aguilar, 515 U.S. 593, 600 (1995) (recognizing that although no obstruction occurs when an individual lies to FBI agents who might or might not testify before a grand jury, it may occur if the "agents acted as an arm of the grand jury, or indeed that the grand jury had even summoned the testimony of these particular agents"). The fact that an agency cannot perform a particular function itself or through its own labor is of no moment; rather the question is whether the agency proceeding affirmatively, by its specific actions, seeks to have the particular function performed as part of the proceeding.

The purpose of the SEC's initial proceeding,/1 investigating the securities law violations of Lauer, Senffner, and CCI, was not solely to investigate those violations for the sake of exposing them, but also to identify and recover CHA funds involved in the violations to remedy them. More to the point, that proceeding did not end by

virtue of the filing of the lawsuit. To the contrary, the SEC prosecution of the lawsuit was a natural extension of that proceeding, and its efforts to recover and return the funds were necessary to achieve its goal. By obstructing the recovery of CHA funds, Senffner obstructed the district court, and, as a consequence, the SEC's initial investigation and enforcement of securities law violations (an SEC proceeding), which sought the return of the funds.

There exists, however, a more "direct" obstruction in this case. Assuming that the SEC's tracing of the funds was separate from its initial proceeding, that investigation constitutes a proceeding, even though the SEC lawsuit was already in progress and the SEC used the district court's process rather than its own. An SEC investigation is a "proceeding"--a term that is defined rather broadly--for the purpose of section 1505. See, e.g., United States v. Kelley, 36 F.3d 1118, 1127 (D.C. Cir. 1994); United States v. Schwartz, 924 F.2d 410, 423 (2d Cir. 1991). And, sufficient to distinguish an investigative proceeding (from a mere police investigation) is the authority to issue subpoenas and administer oaths. See Kelley, 36 F.3d at 1127. However, that does not mean that every aspect of the investigation must proceed under that authority.

We are not alone in reaching these conclusions. The Ninth Circuit has also rejected the very same argument in similar circumstances. See United States v. Hopper, 177 F.3d 824, 830-31 (9th Cir. 1999). In Hopper, the IRS sought to collect unpaid taxes from members of the Juris Christian Assembly (a front for a tax evasion scheme), by placing an IRS tax levy on the salary of one of the members and a lien on the property of another. Id. at 828. They also obtained a judgment for the debt and a lien from a federal district court. Id. The members attempted to frustrate the enforcement of the levy and judgment lien by submitting false checks. Id. at 828-29. Two of the defendants were prosecuted for obstruction of an agency proceeding under section 1505 for their submission of a false check to the U.S. Marshall Service in satisfaction of the judgment lien. Id.

at 830. They claimed that they had only obstructed the judgment of the federal district court, not an IRS proceeding. Id.

In rejecting their argument, the Hopper court concluded that the "enforcement of tax liens by the IRS is an IRS proceeding. The fact that the IRS was required to enforce its lien in federal court does not change the IRS's involvement. It was an IRS tax lien, prosecuted by an Assistant United States Attorney representing the IRS, and any money collected would have been paid to the IRS." Id. at 831 (emphasis added). Additionally, and more broadly, Hopper concluded that "collection of delinquent taxes is an IRS proceeding." Id. (emphasis added). Therefore, obstruction of either proceeding, i.e., the IRS's efforts to enforce a lien in federal district court or collect delinquent taxes, violated section 1505, notwithstanding the intermediary involvement of the federal district court. Id.

Although Senffner tries to distinguish Hopper by pointing out that in that case the IRS was owed the particular debt, and the district court did not take control of the property involved there, neither distinction is persuasive. The SEC's interest, that the securities laws are properly enforced, is a concrete interest and it does not matter that the SEC was not itself actually harmed. The injury to its interest, the securities law violations in this case, could only be remedied if the funds were returned to their proper owner in accordance with the law. Not until that occurred was the agency proceeding completed. Whether the district court had control of the property or not is simply a rerun of Senffner's first argument, which we have already rejected.

2. Endeavoring to obstruct.

Senffner also argues that the evidence was insufficient to convict him of obstruction of a proceeding pending before the SEC under section 1505, because the government failed to prove that he "endeavored" to obstruct an SEC proceeding. He argues that there was no evidence that he believed his transfer would frustrate an SEC proceeding, or

that after the filing of the lawsuit, the SEC's initial proceeding continued. The jury rejected his characterization of the facts, as we do.

In order to prove that Senffner "endeavored" to obstruct an SEC proceeding under section 1505, the government need only show that Senffner's actions had the "natural and probable" effect of interfering with that proceeding. Cf. Aguilar, 515 U.S. at 599 (requiring the same for the similar obstruction provision in 18 U.S.C. sec. 1503). Such a showing is sufficient to satisfy the requisite mental state required in section 1505. Cf. id. We believe the government has met that burden.

To start, Senffner knew that the SEC was investigating and accounting for all of the funds in the lawsuit. At a minimum, his covert activity concealing the Tennessee Receiver check and his solicitation of Lauer to stall serves as evidence of that fact. The jury could have reasonably determined that his actions, in concealing the Tennessee Receiver check, also had the natural and probable effect of obstructing that investigation proceeding.

In addition, Senffner knew that the SEC initiated a proceeding before filing the lawsuit, and that the SEC brought the lawsuit and was prosecuting it as a result of that proceeding. He also knew that the purpose of those efforts was to recover the CHA funds and that purpose could not be achieved until all the funds had been returned. The jury could have reasonably determined that Senffner knew that the initial proceeding was not complete and continued until the funds were recovered. From that, the jury could have also reasonably determined that by concealing the Tennessee Receiver check, Senffner knew that he was obstructing that proceeding.

For these reasons, we conclude that Senffner has failed to show that the evidence was insufficient to support his conviction.

B.  Evidentiary Rulings

Senffner makes two evidentiary challenges. First, he argues that the

district court erred by admitting his prior civil contempt at his criminal contempt trial. Second, he asserts that the district court erred by admitting "voluminous" bad acts not charged in the indictment, which should have been excluded under Federal Rule of Evidence 404(b). We reject each argument.

When presented with claims of error in the district court's admission of evidence, we review for abuse of discretion. United States v. Johnson, 127 F.3d 625, 630 (7th Cir. 1997). We give the district court great deference in such matters, and we will not substitute our judgment in place of the judgment of the district court. United States v. Van Dreel, 155 F.3d 902, 905-06 (7th Cir. 1998); United States v. Bradley, 145 F.3d 889, 892 (7th Cir. 1998). We only consider whether any reasonable person could agree with the district court.

1. Opening the door.

Senffner argues that the district court erred by admitting his prior civil contempt at his criminal contempt trial, and that he was unfairly prejudiced by its admission, relying on United States v. Boyd, 208 F.3d 638, 641 (7th Cir. 2000) (recognizing potential reversible error by disclosing defendant's prior jury conviction) vacated on other grounds by Boyd v. United States, 531 U.S. 1135 (2001) and United States v. Thomas, 155 F.3d 833, 836 (7th Cir. 1998) (stating that it was an abuse of discretion to admit testimony that administrative proceeding had previously adjudicated a fact constituting an element of the offense)./2 But the district court ruled, and we agree, that Senffner opened the door to the testimony of his prior civil contempt./3

In the first count, contempt of court, the indictment charged that Senffner "willfully disobeyed and resisted [the temporary restraining order]" by transferring the Tennessee Receiver check and "failing to reverse or disclose this transfer." During cross-examination of a government witness, Senffner asked whether the funds had been returned to the SEC by late August. The witness responded that the funds were returned "[w]hatever day that Mr. Senffner had

been ordered by the Court to submit was the day that the money came back." On re-direct the government briefly asked questions related to this topic. In response, the witness stated that Senffner had been held in contempt of court and ordered to return the funds by that date.

Ordinarily, an inquiry into the date of an incident's occurrence would not warrant further inquiry by the government into the reason for that incident's occurrence--the proverbial "door" is not that wide open. Cf. Thomas, 155 F.3d at 836 (holding that misleading testimony regarding the purpose of a proceeding did not warrant inquiry into the result of the proceeding). But that is not what occurred here. Senffner questioned the witness about whether he had failed to reverse the transfer, then asked him again to respond that the funds had been returned (and ergo the transfer reversed). That was misleading. Senffner reversed the transaction, but only because he was under a court order, a fact the government then had the opportunity to reveal. Senffner opened the door to this testimony, and the district court did not abuse its discretion by admitting the evidence. See United States v. Touloumis, 771 F.2d 235, 241 (7th Cir. 1985) ("We have reasoned that a party cannot be permitted on the one hand to introduce evidence that appears favorable to his argument and then complain, after the circumstances are fully developed, because the evidence becomes detrimental to his cause.").

2. Other bad acts under Rule 404(b), and the inextricably intertwined doctrine.

Senffner argues that the district court improperly admitted all the other bad acts evidence that preceded his unlawful concealment of the Tennessee Receiver check under Rule 404(b). He asserts that this conduct was not part of the charged conduct, but was "other crimes, wrongs, or acts" within the meaning of the rule. He also implicitly urges this court to adopt a more restrictive interpretation of the inextricably intertwined doctrine, suggesting that to include his prior bad acts in that doctrine would be an unnecessary and unwarranted erosion of the protection offered by Rule 404(b).

Without citing the cases, Senffner repeats other courts' criticisms of our standard. See, e.g., United States v. Bowie, 232 F.3d 923, 928 (D.C. Cir. 2000) ("The 'complete the story' definition of 'inextricably intertwined' threatens to override Rule 404(b). A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could 'complete the story' or 'incidentally involve' the charged offense or 'explain the circumstances.' If the prosecution's evidence did not 'explain' or 'incidentally involve' the charged crime, it is difficult to see how it could pass the minimal requirement for admissibility that evidence be relevant."). We reject his invitation to narrow that doctrine. All the evidence admitted in Senffner's trial (except the civil contempt evidence) fits within the inextricably intertwined doctrine, as we have defined it. Rule 404(b) does not apply.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). We have stated, on more than one occasion, under the inextricably intertwined doctrine, that acts "concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of 'other acts' within the meaning of Fed. R. Evid. 404(b)." United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995) (citing cases).

And, so long as those acts meet the requirements of Rule 403,/4 they may be admitted in evidence at trial. United States v. Hargrove, 929 F.2d 316, 320 (7th Cir. 1991). Acts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime. See United States v. Hughes, 213 F.3d 323, 329 (7th Cir. 2000), vacated on other grounds, Hughes v. United States,

531 U.S. 975 (2000); United States v. Gibson, 170 F.3d 673, 681 (7th Cir. 1999).

We adhere to this precedent, and are unpersuaded by Senffner, or other courts that share his view. Rule 404(b) is designed to address a particular evidentiary problem, guarding against the presentation of prior acts solely to prove bad character, because a long history of experience has consistently shown that this type of evidence is of negligible value, inflicting more unfair prejudice than revealing helpful truths. See Huddleston v. United States, 485 U.S. 681, 687-89 (1988); Michelson v. United States, 335 U.S. 469, 475-76 (1948). Evidence of acts that are joined with the crime itself, however, occupy a different stature by nature. That these acts share a relationship with and connection to the crime (even in a broad sense) significantly restricts the ability of the government to offer bad acts by the defendant, which is consistent with the historical and legislative purpose of Rule 404(b). See Fed. R. Evid. 404 advisory committee's note. It also sufficiently removes those acts from the language of the per se proscription in Rule 404(b), which only prohibits "other" bad acts. See United States v. Roberts, 933 F.2d 517, 520 (7th Cir. 1991) (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989)). That evidence is still subject to the probative/prejudicial balancing requirements of Rule 403. Indeed, if Rule 404(b) is doing any work at all, it is to codify centuries of experience applying Rule-403-type probative/prejudicial balancing in the specific context of other bad acts./5 See generally Jennifer Y. Schuster, Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence, 42 U. Miami L. Rev. 947, 947-61 (1988).

Therefore, we do not believe that we must more narrowly tailor the inextricably intertwined doctrine to save Rule 404(b) or better serve its purpose. The doctrine itself is already a narrow one, and any perceived over-inclusiveness in the doctrine as we define it is inconsequential, because Rule 403 (like Rule 404(b)) protects against the unnecessarily prejudicial presentation of

barely probative evidence. We rely on the more flexible balancing of Rule 403 than the per se proscription of Rule 404(b) for related conduct evidence on the margin. Our definition of the inextricably intertwined doctrine reflects that preference. We agree, however, that courts should remain on guard to preserve the per se force of Rule 404(b), but not with such vigor that it needlessly restricts the fair and just presentation of evidence at trial.

With this discussion in mind, we turn to Senffner's objections to the following evidence:

(1) The approximately $15 million that Senffner and Lauer illegally appropriated (stole) from the CHA;/6

(2) The illegal commissions (bribes) between Senffner and Lauer on CHA contracts;

(3) The false statements made by Senffner to the Postal Inspector investigating Randy and Canadian Trade Bank;

(4) The perjury by Senffner at Randy's trial; and

(5) The false documents and false claims submitted by Senffner to the bankruptcy court.

His first two objections--where and how Senffner obtained the funds that were subject to the district court's order-- represent the beginning of this criminal venture. The evidence of the relationship between Senffner and Lauer, and their use of the CHA's funds, shows how this criminal enterprise began and developed throughout the life of the investment fraud scheme. We have often upheld the admission of such evidence. See United States v. Ward, 211 F.3d 356, 362 (7th Cir. 2000); United States v. Zarnes, 33 F.3d 1454, 1469 (7th Cir. 1994); United States v. Diaz, 994 F.2d 393, 395 (7th Cir. 1993).

Each of the remaining three other bad acts was part of the cover-up to conceal Senffner's failed and illegal investments. That Senffner made false statements to a federal agent, perjured himself in federal court, and submitted false documents and claims to a

bankruptcy court, are part of the circumstances in which Senffner misappropriated, illegally invested, lost, fraudulently attempted to recover and reinvest, CHA assets. This conduct ultimately culminated in his concealment of CHA assets under court order. His acts were a prelude to the particular crime for which he was charged and were a pattern of conduct in a prolonged (but singular) investment fraud scheme./7 See United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir. 1995) ("Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity.").

III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is Affirmed.

FOOTNOTES

/1 Senffner does not dispute that the initial SEC investigation was a proceeding.

/2 Federal Rule of Evidence 403, which provides for the exclusion of evidence when its probative value is substantially outweighed by its prejudicial effect, is the proper rule under which such claims should be analyzed.

/3 The government argues that Senffner waived this argument by rejecting a potential curative instruction. However, we need not resolve the waiver question in light of our decision that Senffner opened the door to this evidence.

/4 It provides: [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.

/5 In this regard, Rules 404(b) and 403 are analogous to the judicial application of per se and rule of reason analyses under Section 1 of the Sherman Act. See generally Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 344 (1982) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable.").

/6 Senffner argues that this money was not misappropriated or stolen; however, that determination does not affect our analysis. In addition, over-

whelming evidence demonstrates that the money was misappropriated.

/7 We do not address whether the evidence was properly admitted under Rule 403, because Senffner has not raised that issue on this appeal. However, we note that Senffner would have great difficulty showing that any error was not harmless in light of the overwhelming evidence of his guilt.