**UNITED STATES of america,**
**Plaintiff–Appellee,**

v.

**Bruce G. PECK, Defendant–Appellant.**

**No. 01–5586.**

United States Court of Appeals,
Sixth Circuit.

March 19, 2003.

Before RYAN, CLAY and GIBBONS, Circuit Judges.

GIBBONS, Circuit Judge.

Bruce Peck was convicted by a jury of sixty counts of filing false claims for tax refunds, in violation of 18 U.S.C. § 287, and twenty counts of filing false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2). Peck appeals his conviction on the grounds that the district court erred in denying him a continuance, failing to consider whether he was qualified for appointed counsel, and admitting evidence of uncharged crimes. Peck also argues that reversal is required because the prosecutor made statements in closing arguments that improperly commented on Peck's right to silence. For the reasons set forth below, we deny Peck's appeal and affirm his conviction.

I.

On February 7, 2000, a federal grand jury returned a sixty-count indictment against Peck charging him with filing false claims for tax refunds, in violation of 18 U.S.C. § 287. After Peck's arrest, the magistrate judge held a detention hearing and released Peck on bond with strict conditions. The conditions of Peck's release prohibited him from preparing tax returns. On April 13, 2000, the United States moved to revoke Peck's bond. The district court scheduled a bond revocation hearing for April 19, 2000. Peck failed to appear at the hearing in violation of the conditions of his release. Peck was arrested in Minnesota on May 4, 2000. On June 28, 2000, the magistrate judge held a hearing on the United States' motion to revoke Peck's bond. The evidence presented at the hearing established that Peck had fled the jurisdiction, refused to return, and possibly attempted to fake his own death. The evidence further revealed that Peck had prepared tax returns in violation of the conditions of his release. Based on the evidence presented, the magistrate judge found that Peck had violated numerous conditions of his bond and ordered that his bond be revoked. Peck appealed the magistrate judge's ruling revoking his bond, and the district court affirmed on the grounds that there was probable cause to believe that Peck had violated the conditions of his bond by preparing tax returns and that Peck was unlikely to abide by any condition or combination of conditions of release.

On June 5, 2000, the grand jury returned a superseding indictment adding twenty-three counts to the sixty counts brought in the original indictment. One of the eighty-three counts, count sixty-one, which relates to Peck's failure to appear at the April 19, 2000, hearing on the United States' motion to revoke Peck's bond, was later severed on Peck's motion. Counts one through sixty of the superseding indictment charged Peck with filing sixty federal income tax returns which claimed fraudulent tax refunds during 1994, 1997,

and 1998. The indictment alleged that Peck used the names and social security numbers of minor children of his tax clients and others to claim income tax refunds on a false or fraudulent basis. Counts sixty-two through eighty-three charged Peck with manufacturing false tax losses and deductions relating to various companies and claiming such losses and deductions to reduce the tax owed by his clients.

Peck was originally represented by Scott Cox, who was later allowed to withdraw. The order allowing Cox to withdraw also appointed a federal public defender to represent Peck. The federal defender represented Peck until Peck retained Brian Davis. Davis entered an appearance as counsel for Peck on June 28, 2000. Also on June 28, 2000, Peck signed a waiver of assignment of counsel acknowledging that he was voluntarily waiving his right to appointment of counsel. On October 6, 2000, Davis filed a motion to withdraw stating that Peck had advised Davis that Peck wished to represent himself in this case. The district court granted Davis's motion to withdraw, but the court appointed Davis as "stand-by counsel for the defendant to assist him at future hearings or trial as may be necessary." In granting Peck's request that the court permit him to represent himself, the court advised Peck in open court "of the hazards and disadvantages that follow self-representation" and "strongly urge[d]" Peck not to represent himself. The district court followed the Benchbook for United States District Judges in conducting an inquiry on the record regarding Peck's decision to represent himself. The district court specifically asked Peck whether his decision to represent himself was "entirely voluntary." Peck responded, "Yes, sir."

At the time the district court granted Peck's request to represent himself, Peck's case was set for trial on November 29, 2000. The trial was subsequently continued until January 8, 2001. Trial proceedings began on January 8, 2001, and lasted for approximately two weeks.

At trial, the United States presented evidence that Peck filed false tax returns, which claimed fraudulent refunds, under the names and social security numbers of Peck's tax clients. Peck filed several of the false returns in the names of minor children, including his own children and grandchildren. In carrying out his scheme, Peck used several different addresses as the taxpayer's address, all of which were either connected to Peck or were his own personal addresses. Peck had access to the mail at all of the addresses listed on the false returns. Peck also created false W–2 forms for each taxpayer and submitted the W–2 forms along with the returns. Individuals employed, or previously employed, by the companies listed on the W–2 forms testified that the companies did not employ the individual listed on the W–2 form submitted by Peck or that the company was out of business at the time the return was filed. Peck's handwriting was present on most of the returns at issue. In addition, Peck's fingerprints were on many of the relevant documents, including the returns. While these false tax returns claimed refunds, none of the federal refunds for 1994 were issued because they were removed as suspicious at the IRS Service Center. Only one federal refund check for 1997 issued.

The United States also presented evidence at trial that Peck "sold" interests to his tax clients in companies that he claimed had tax losses. Peck advised his clients that he had purchased companies with tax losses and that he could sell the client an interest in one of these compa-

nies, thereby allowing the client to use part of the losses on his or her tax return to decrease the client's tax liability. Peck informed clients of the amount the client "owed" him for the purchase of the loss and requested that the client send him a check for that amount after the client received his or her refund check. The evidence showed that Peck essentially used four companies to carry out this scheme: Advantage Mobile Homes, Ace–in–the–Hole, Corzine, and Sundial. The original owners of each of these companies testified that these companies did not experience the losses claimed by Peck and, moreover, the companies were not in business in the years the losses were reported on the charged returns. Furthermore, the owners testified that no part of or interest in the companies was ever sold to Peck or anyone else.

On January 18, 2001, the jury found Peck guilty on eighty of the eighty-two counts in the superseding indictment. The district court entered the final judgment in the case on May 10, 2001, imposing a term of imprisonment of ninety-seven months, a supervised release period of three years, restitution of $350,120, and special assessments totaling $8,000. This timely appeal followed.

## II.

Peck first claims that the district court erred in failing to grant him a continuance of the trial. The decision of whether to grant or deny a continuance in order to give the defense additional time to prepare is within the discretion of the trial court, and the trial court's decision is entitled to great deference. *See United States v. Martin,* 740 F.2d 1352, 1360 (6th Cir.1984); *see also United States v. Cronic,* 466 U.S. 648, 662 n. 31, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (noting that a "trial court's refusal to grant the defense additional time to prepare for trial" must be given "great deference.") This court reviews a trial court's decision regarding the grant or denial of a continuance for an abuse of discretion. *See Martin,* 740 F.2d at 1360 (citations omitted). In determining whether the trial court abused its discretion, this court considers whether the defendant "suffered any actual prejudice as a result of the denial, whether additional time would have produced more witnesses or have added something to the defendant's case." *Martin,* 740 F.2d at 1361.

On the morning of trial, Peck requested that the district court grant him a continuance. The court did not grant Peck's request and proceeded with the trial. Peck claims that the denial of the continuance prevented him from having a reasonable opportunity to prepare a defense in light of the complexity of the case, the fact that he was in custody, and the government's service of additional exhibits on him a few days prior to trial. Based on the court's denial of a continuance, Peck argues that his conviction should be overturned.[1]

General allegations that the complexity of a case requires additional preparation time are insufficient to establish abuse of discretion by a trial court in failing to grant a continuance. *See Martin,* 740 F.2d at 1361. In *Martin,* this court held that the trial court did not abuse its discre-

---

1. In support of his argument that the district court erred in failing to grant him a continuance, Peck relied on the Tenth Circuit's opinion in *United States v. Cronic,* 675 F.2d 1126 (10th Cir.1982). Peck's reliance on the Tenth Circuit's opinion in *Cronic* is misplaced, however, because the opinion in that case was reversed by the United States Supreme Court in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic,* the Supreme Court found circumstances analogous to the instant case insufficient to warrant reversal of the defendant's conviction. *Id.* at 666–67, 104 S.Ct. 2039.

tion, despite the defendant's allegations regarding the complexity of the case, when counsel had more than a week to prepare for trial and "presumably had access to the fruits of appointed counsel's earlier preparation efforts." *Id.* In addition, when a defendant chooses to assert the right of self-representation, he forfeits the benefits associated with representation by legal counsel. *See Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). For example, this court has specifically held that the government has no obligation to provide access to a law library to defendants who wish to represent themselves in criminal trials. *See United States v. Sammons,* 918 F.2d 592, 602 (6th Cir.1990).

In the present case, the superseding indictment was issued more than seven months prior to Peck's trial date and, while acting as his own counsel, Peck had seventy-seven days to prepare his case for trial. Peck also presumably had access to the fruits of the preparation efforts of his three prior attorneys. The district court specifically advised Peck that his detention would be a hindrance to his preparation. Peck informed the court that he understood, but still insisted on representing himself. Furthermore, contrary to Peck's assertions, the government did not submit seventeen "new" exhibits days before trial. Instead, the exhibits were summary exhibits of figures to which Peck previously had access.

■ Peck has failed to establish that he suffered actual prejudice as a result of the district court's denial of a continuance or that additional time would have produced more witnesses or added something to his case. Here, Peck had adequate time to prepare for trial despite the complexity of the case and his custody status. The government's submission of summary exhibits a few days before trial did not affect his defense. Accordingly, the district court did not abuse its discretion in denying Peck's motion for a continuance.

Peck next argues that the district court erred in failing to properly advise Peck regarding his decision to represent himself by failing to inquire about his eligibility for appointed counsel and further interfered with Peck's right to counsel or self-representation by appointing stand-by counsel and severely limiting stand-by counsel's role during trial. In *Faretta v. California,* the Supreme Court held that the Sixth Amendment implies a right of self-representation. 422 U.S at 821, 95 S.Ct. 2525. When a defendant chooses to invoke the right of self-representation, he foregoes, as a factual matter, the benefits associated with representation by legal counsel. *Id.* at 834, 95 S.Ct. 2525. Because these benefits are of the utmost importance in a criminal proceeding, an individual who wishes to represent himself must waive the right to counsel "knowingly and intelligently" on the record. *Id.* at 835, 95 S.Ct. 2525.

Peck does not argue that his waiver of his right to counsel was not knowing, intelligent, and voluntary. As the record demonstrates, Peck waived his right to counsel with a clear understanding of the nature of the charges, the possible punishment, the requirements that he adhere to the Federal Rules of Evidence and Criminal Procedure, and the dangers and disadvantages of self-representation. According to the record, the district court properly ensured that Peck understood the significance and consequences of his decision to represent himself. Although the decision to represent himself may not have been in Peck's best interest, the record supports the district court's conclusion that Peck was competent to make that choice, and that he did so knowingly and voluntarily.

Peck instead argues that the district court erred in failing to inquire about Peck's ability to afford retained counsel and eligibility for appointed counsel after he expressed that one of the reasons he was electing to represent himself was to avoid putting any undue financial hardship on his family. Because Peck acknowledges that his waiver of counsel was knowing and voluntary, the court's failure to inquire further about Peck's eligibility for appointed counsel is reviewed for an abuse of discretion. *See United States v. Pleasant,* No. 99–1880, 2001 WL 391969, (6th Cir. April 12, 2001) (noting that a district court's denial of a defendant's request for self-representation after the defendant unequivocally waived his right to self-representation is reviewed for abuse of discretion). Peck offers no support for his assertion that a trial court is required to inquire, *sua sponte,* about a defendant's eligibility for appointed counsel upon an assertion by a defendant that he is waiving his right to counsel for financial reasons. In this case, even if the district court was required to conduct such an inquiry, Peck had previously waived his right to appointed counsel. After Peck's first attorney, Cox, was permitted to withdraw, the court appointed the federal defender.[2] The government opposed the appointment of counsel arguing that Peck had adequate financial resources to retain counsel. Before the district court had an opportunity to determine whether Peck should be denied appointment of counsel, Peck signed a waiver of appointment of counsel and retained Davis as his attorney. Because Peck's decision to waive his right to appointment of counsel was voluntary, he did not attempt to revoke his waiver of appointment of counsel, and he has failed to establish that he would have accepted or even been entitled to appointment of counsel if the district court had asked about his financial condition, the district court did not abuse its discretion in failing to inquire about Peck's financial status.

Peck also claims that his request that his stand-by counsel take a more active role in the trial acted as a revocation of his waiver of counsel before the trial began. In response to Peck's request that standby counsel become more involved in his defense, the district court advised Peck that he could either choose to be represented by a lawyer or he could represent himself. The court stated that if Peck chose to be represented by a lawyer, then he would be required to pay legal fees. Peck contends that the district court's statements that he would be required to pay for a lawyer infringed on his right to counsel.

Peck offers no legal support for his contention that his request that stand-by counsel assume a more active role in the defense acted as a revocation of his waiver of his right to counsel. This court has held that:

> The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other. While it may be within the discretion of a District Court to permit both a criminal defendant and his attorney to conduct different phases of the defense in a criminal trial, for purposes of determining wheth-

---

**2.** The record does not reflect whether Peck ever made a formal request for appointed counsel. The record only reflects that the court appointed the federal defender, Peck filed a financial affidavit in support of a request for counsel, and the government filed a Memorandum in Opposition to Peck's Request for Appointment of Counsel. According to the government's memorandum, Peck had "nearly $14,000 in cash in his accounts, over $25,000 in personal property, and an annual income of over $250,000 in recent years."

er there has been a deprivation of constitutional rights a criminal defendant cannot logically waive or assert both rights.

*United States v. Conder*, 423 F.2d 904, 908 (6th Cir.1970) (citations omitted). Whether to allow a defendant to participate in his own defense along with counsel in "hybrid representation" is a matter committed to the sound discretion of the trial court. *United States v. Mosely*, 810 F.2d 93, 97–98 (6th Cir.1987) (citations omitted).

■ In the instant case, Peck never attempted to revoke his waiver of his right to counsel. Instead, Peck mentioned that he had "some thought" of having his stand-by counsel, Davis, act as "co-counsel." In response, the district court advised Peck that he could hire Davis as his counsel, but Davis could not act as his co-counsel. The district court reminded Peck that he was free to "elect a lawyer to represent" him and advised Peck that if he did not have the funds to hire a lawyer, the court would have Davis represent Peck and "assess the costs to [Peck] at the end of the trial." In addition, the court had previously advised Peck that the court would not permit "a hybrid type trial."

■ As this court has pointed out, "[t]here are obvious justifications for the refusal to allow hybrid representation in criminal trials," including the "potential for undue delay and jury confusion" and inevitable "conflicts and disagreements as to trial strategy." *Mosely*, 810 F.2d at 98. Here, Peck did not revoke his waiver of his right to counsel. The district court assured Peck that he would be able to "call on" his stand-by counsel and that stand-by counsel would be present at trial. Therefore, the district court did not abuse its discretion in refusing to allow hybrid representation and limiting the role of stand-by counsel.

■ In addition, the district court's statements that Davis could represent Peck, but the costs of Davis's representation would be assessed to Peck did not infringe on Peck's right to request counsel. As an initial matter, after Peck requested that he be permitted to represent himself and the court granted his request, Peck never asked the court to appoint counsel. Instead, Peck inquired about the possibility of Davis acting as co-counsel. Peck has failed to present any evidence that he was not financially capable of either retaining counsel or paying Davis after trial. While it is not permissible to condition a defendant's right to court-appointed counsel upon the prepayment of legal fees or costs, "when court-appointed counsel is provided, it is constitutionally permissible to require the defendant to repay the expense incurred by the state in providing the representation if the defendant later becomes able to repay." *Hanson v. Passer*, 13 F.3d 275, 279–80 (8th Cir.1994) (finding that the trial court erred by conditioning the defendant's right to court-appointed counsel upon the prepayment of $1000, but noting that if the trial court had "immediately appointed counsel and required [the defendant] sometime in the future to contribute toward the cost of his defense ... the arrangement would have passed constitutional muster.")

In the present case, the district court stated that if Peck decided not to represent himself, then Peck could "use Mr. Davis," but the court would assess the costs of Davis's representation to Peck at the end of trial. The district court's offer to have Davis act as counsel for Peck on the condition that Peck pay the costs of his defense in the future, as opposed to prepayment or immediate payment, was not error.

With respect to Peck's third assignment of error, Peck asserts that the district

court admitted evidence regarding uncharged crimes in violation of Rule 404(b) of the Federal Rules of Evidence. Specifically, Peck contends that the district court deprived him of his right to a fair trial when it refused to exclude evidence relating to state tax returns. At trial, the government argued that evidence relating to state tax returns was admissible because such evidence was "intrinsic to what happened to these federal returns." The government maintained that the admission of the evidence relating to state tax returns was "not an issue of 404(b)." In denying Peck's motion to exclude evidence of any state tax returns, the district court stated that it was "going to let them come in for what value they might have." The district court further stated that the jury would be admonished in that regard.

■ Where the challenged evidence is inextricably intertwined with evidence of the crimes charged, Rule 404(b) is not implicated. *See United States v. Everett*, 270 F.3d 986, 992 (6th Cir.2001). Peck fails to present any support for his argument that the evidence relating to state tax refunds was not "inextricably intertwined" with evidence of his federal tax fraud scheme. The record shows that Peck created and executed a comprehensive tax fraud scheme. Peck not only filed false federal returns, he created numerous other documents in an effort to create the appearance that the federal returns were legitimate, including state tax returns. Therefore, the district court did not abuse its discretion in refusing to exclude the evidence. *See also United States v. Tarwater*, 308 F.3d 494, 516–17 (6th Cir.2002) (finding that challenged evidence relating to Medicare and Medicaid fraud was inextricably intertwined with evidence of the crimes charged, tax fraud, and, therefore, the district court did not abuse its discretion in refusing to exclude such evidence).

Finally, Peck contends that the prosecutor made improper statements during closing arguments sufficient to require reversal. Peck, however, failed to object to the prosecutor's statements during trial. When a defendant fails to object to prosecutorial comments during trial, the defendant waives any error for purposes of appeal unless he can show plain error. Fed. R.Crim.P. 52(b); *see also United States v. Thomas*, 11 F.3d 620, 630 (6th Cir.1993) (discussing the Rule 52(b) analysis).

Direct comment on a defendant's failure to testify is forbidden by the Fifth Amendment. *See Griffin v. California*, 380 U.S. 609, 613–14, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). "[W]hen a prosecutor makes indirect references to a defendant's failure to testify ... the prosecutor's comments constitute error when the statement was either manifestly intended or was of such character that the jury would necessarily construe it as a comment on the failure of the defendant to testify." *United States v. Randolph*, 173 F.3d 857, Nos. 97–5990/59991, 1999 WL 98564, at \*5 (6th Cir. Jan.27, 1999) (citing *United States v. Ursery*, 109 F.3d 1129, 1134 (6th Cir.1997)). In addition, a prosecutor may comment on a defendant's failure to call a witness or to otherwise present exculpatory evidence so long as the comment was not manifestly intended or was not of such character that the jury would necessarily take it to be a comment on the defendant's failure to testify. *See Ursery*, 109 F.3d at 1135 (establishing that it is permissible for a prosecutor to comment on the defense's failure to present exculpatory evidence provided that the statement was not manifestly intended or was not of such character that the jury would necessarily construe it as a comment on the defendant's failure to testify); *see also United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir.2000).

Peck contends that, during closing arguments, the prosecutor improperly commented on his right to silence. Specifically, Peck complains about the prosecutor's statement in rebuttal that:

The reason why Mr. Peck found it extremely difficult to confine his closing argument to the evidence in this case is because there is virtually no evidence that supports him. In fact, the unanimous, all, virtually every bit of evidence that came in points in one singular direction, and that is directly at Bruce Peck.

Before the prosecutor made the challenged statement in rebuttal arguments, the district court admonished Peck on several occasions during his closing argument to confine his remarks to the evidence and the inferences that could be drawn from it. Peck repeatedly attempted to inform the jury of facts that were not introduced as evidence during trial. In rebuttal, the prosecutor responded to Peck's inability to limit his argument to the evidence.

■ When viewed in context, the prosecutor's comment was not manifestly intended to reflect on Peck's decision not to testify and the comment was not of such character that the jury would necessarily view the statement as a reflection on Peck's silence. *See Randolph*, 1999 WL 98564, at * 6. Moreover, the prosecutor's comment was isolated, inadvertent, and there was strong independent evidence of Peck's guilt. Therefore, there is no plain error.

### III.

For all the reasons set forth above, we affirm the conviction of Bruce Peck.

ERIC L. CLAY, Circuit Judge, concurring.

I agree with the Court's conclusion and most of its reasoning. I write separately,

however, to state that the evidence of Peck's fraudulent state tax returns was not "inextricably intertwined" with the evidence of his federal tax fraud scheme. As the majority opinion correctly observes, Fed.R.Evid. 404(b) does not apply "when the challenged evidence is 'inextricably intertwined' with evidence of the crime charged." *United States v. Everett*, 270 F.3d 986, 992 (6th Cir.2001) (citing *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir.1995)). As one court explained:

Acts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime.

*United States v. Senffner*, 280 F.3d 755, 764 (7th Cir.2002); *see also United States v. Williams*, 291 F.3d 1180, 1189 (9th Cir. 2002) ("Evidence is 'inextricably intertwined' if it 'constitutes a part of the transaction that serves as the basis for the criminal charge' or 'was necessary to . . . permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.' ") (quoting *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012–13 (9th Cir.1995)) (alteration in *Williams*); *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.1984) (defining evidence as "intricately intertwined" when exclusion of it leaves a conceptual and chronological void).

The government argued that the state returns formed part of Peck's complex tax fraud scheme because, along with the false W–2 forms and phony employer's returns, the state forms helped make the federal returns appear legitimate. The government also felt the state returns were nec-

essary to establish Peck's identity as the guilty party. Yet the government did not claim that the evidence was necessary to establish Peck's intent. It is hard to believe the government needed the evidence to prove that Peck, an experienced tax preparer, did not "accidentally" file dozens of fraudulent federal returns; nor did the government need the fraudulent state return evidence to show Peck knew that what he was doing was illegal.

The state tax returns did not directly form the basis for the actual crimes charged and the government did not need to present this obviously prejudicial material to avoid "a chronological or conceptual void in the story of the crime." *Senffner*, 280 F.3d at 764. The majority cites *United States v. Tarwater*, 308 F.3d 494, 516–17 (6th Cir.2002), in support of its conclusion that the evidence was "inextricably intertwined." As the majority explains, *Tarwater* found "that challenged evidence relating to Medicare and Medicaid fraud was inextricably intertwined with evidence of the crime[ ] charged, tax fraud." Tarwater was an accountant convicted of tax fraud for failing to properly report payments he received from a hospital that retained him to review various Medicare and Medicaid claims. Thus, unlike this case, leaving out the information about the defendant's uncharged but suspicious activity would have created "a chronological or conceptual void in the story of the crime." *Senffner*, 280 F.3d at 764.

Assuming Rule 404(b) did apply, the trial court erred by failing to " 'carefully identify, in its instructions to the jury, the specific factor named in the rule that is relied upon to justify admission of the other acts evidence, explain why that fact was material, and warn the jurors against using the evidence to draw the inferences expressly forbidden in the first sentence of Rule 404(b).' " *Everett*, 270 F.3d at 991–92

(quoting *United States v. Spikes*, 158 F.3d 913, 929 (6th Cir.1998)). The district court offered this limiting instruction:

> The jury is admonished that [Peck] [i]s on trial for any wrongdoing which might have involved the [state returns] that the Government has introduced.... He is not on trial for those documents in any way. Thank you and you have to remember that when you're trying the case. This is not a state violation at all that he's on trial for. It is hard to do, but they [sic] must do it.

(J.A. at 205.) Under *Everett*, this instruction is insufficient because the trial court fails to explain to the jury how to properly use the evidence. 270 F.3d at 991–92.

Even so, the mistake was harmless because the government presented overwhelming evidence against Peck. First, multiple witnesses established that the federal returns were false. Peck did not contest this testimony. Second, the evidence that Peck prepared the federal returns is extremely persuasive. Each return contained an address associated with Peck. Each phony W–2 was filed on behalf of a company connected with Peck. Peck's daughter testified that the documents were penned in Peck's handwriting. A fingerprint expert identified Peck's fingerprints on the documents. The overwhelming case against Peck minimizes the mistake with respect to the limiting instruction to the point where the error becomes harmless.

Although I agree with the majority's conclusion and much of its reasoning, I concur separately to emphasize the importance of carefully considering whether to admit evidence of uncharged crimes. Only strict adherence to the rules of evidence guarantees that the jury has chosen to convict because the government met its burden with respect to the charged offense. *See* 1 J. WIGMORE, EVIDENCE 233

(1st ed. 1904) ("The natural and inevitable tendency of the tribunal–whether judge or jury–is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or take the proof of it as justifying a condemnation irrespective of guilt of the present charge.").