# United States Court of Appeals
## For the First Circuit

---

No. 03-1647

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD P. CALLIPARI,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

(Hon. Mary M. Lisi, U.S. District Judge)

---

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Amy M. Baron-Evans, with whom Michael A. Collora, Michael B. Galvin, and Dwyer & Collora LLP, were on brief for appellant.
Marc I. Osborne, United States Department of Justice, with whom Craig N. Moore, United States Attorney, Peter A. Mullin, Special Assistant United States Attorney, and Adam J. Bookbinder, Special Assistant United States Attorney, were on brief for appellee.

---

May 17, 2004

---

**STAHL**, **Senior Circuit Judge**.  A federal jury found defendant-appellant Richard Callipari guilty of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371 (Count One); wire fraud, 18 U.S.C. § 1343 (Counts Two through Eleven); and endeavoring to obstruct a Securities and Exchange Commission proceeding, in violation of 18 U.S.C. § 1505 (Count Twelve).  On appeal from his conviction and sentence, Callipari contends that the district court erred (1) in its instructions to the jury on Counts One through Eleven; (2) in limiting cross-examination and closing argument; (3) in its instructions to the jury on Count Twelve; (4) in denying his motion for judgment of acquittal on Count Twelve; and (5) in calculating the loss amount attributable to him for sentencing purposes.

I.  BACKGROUND

The following recitation of facts comes from an extensive record composed primarily of trial testimony, recorded phone conversations, and records of stock options trades conducted by Callipari and his co-conspirator, Thomas Connolly.  All are described in a light most favorable to the verdict.

A.  **Callipari's tenure at Fidelity Investments**

From December 1993 to April 7, 1997, Callipari was employed by Fidelity Investments, a financial services firm headquartered in Boston, as an equity trader.  Callipari primarily served broker/dealers, which are firms that do not have their own

customers but trade their owners' money. Among these customers were JAS Securities, Rockrimmon Securities, and Andover Securities.

During Callipari's time at Fidelity, Connolly was a Vice President and trader on Fidelity's options desk. Callipari's position at Fidelity was considered higher and more prestigious than Connolly's. Connolly had a history of alcohol and drug abuse and subsequent to the time of the offenses in this case, was diagnosed with bipolar disorder. As an options trader, Connolly bought and sold options on behalf of Fidelity customers. In particular, he facilitated the execution of customer orders for options trades by relaying these orders to the appropriate exchange for execution, such as the Chicago Board of Options Exchange (CBOE). Under Fidelity policies, he could take a "not held" order, which gave him discretion over when to execute the order. His customers, however, still had to approve which options were actually traded.

Callipari and Connolly became friends during their tenure at Fidelity and spoke regularly. Callipari introduced Connolly to Richard Englander, who was a trader for Rockrimmon and later, Andover. Callipari also encouraged his customers, including JAS, to trade options through Connolly.

Before we proceed further with the narrative, we think it important to provide some background on options trading. The offenses involved trading in Standard & Poor's 100 options at the

CBOE. The Standard & Poor's 100, generally known as OEX or OEW, is an index of one hundred major stocks. There are two types of options, calls and puts. The buyer of a call option is entitled to receive a cash payment from the seller if the index closes above a predetermined "strike price" on a specified expiration date. The buyer of a put option receives a cash payment from the seller if the index closes below the strike price on the expiration date. For example, an "OEX Sep 900 call" is a call with a strike price of 900 and expires the third Friday of the September following the sale. If the OEX closes higher than 900 on that day, the seller pays the buyer the difference between 900 and the index, multiplied by $100. If the index closes at or below 900 on the expiration day, the buyer receives nothing.

Puts work in reverse. If the index closes below 900 on the expiration date, the buyer receives the difference between the closing value and 900, multiplied by $100. If the index closes at or above the strike price, the buyer gets zero.

An options buyer is said to have a "long" position in that option while the seller is said to have a "short" position. The risk is greater in the latter because while the buyer risks only the price of the option, the seller faces potentially unlimited liability because in the case of a call the market can rise to any level and for a put because the market can crash to as far as zero. Because of these risks, brokerage firms typically

require customers in "short" positions to deposit a cash margin with the firm at the end of the day on which the option is sold in order to hold the option open overnight. A trader with a short position can eliminate his risk and minimize margin requirements by buying back an equal number of the same options, what is called "closing" the position. He can also reduce his risk by "hedging" the short position by taking a long position in another option of the same type (put or call), tied to the same index, but with a different strike price.

A trade is made by contacting an executing firm. Professional Trading and Research (PTR), located at the CBOE, is one such firm. When a trader requests the services of a PTR clerk in executing a trade, both the trader and the clerk fill out a ticket recording information about the trade. In this case, at the close of each business day, the PTR clerk, usually Anthony Srock, and Connolly's supervisor, Catherine Curran, "recapped" the day's trades over the phone to ensure that they matched.

Each options trader has a clearing house, like Fidelity, that holds his options and cash. Fidelity can also fill a trade order for a customer who clears his trades with another firm. In such cases, Fidelity fills the order and sends the trade either (1) to the Options Clearing Corporation (OCC) pursuant to a clearing member trading agreement (CMTA), which delivers it to the customer's clearing house, or (2) delivers it directly to the

customer's clearing house in what is called a "give-up" trade.  The clearing house receiving a "give-up" can "don't-know" ("DK") a trade and decline it, thereby placing the risk of any loss from the trade on Fidelity.  It is more difficult for a recipient firm to decline a trade transferred through the OCC because firms that have signed a CMTA with each other agree that they will not DK trades sent to the other through the OCC.

In the summer of 1996, Connolly began to trade without orders from a specific customer.  He usually placed the orders with Srock.  Connolly, however, did not fill out the required tickets.  At Connolly's request, Srock did not recap these unauthorized trades.

Connolly made these trades over the phone from Fidelity's options desk, where he sat only a few feet away from Curran.  If the trade was unprofitable, he continued trading under Fidelity's account at the CBOE until it became profitable.  Srock would hold off on submitting the tickets or ask other PTR clerks to delay handling the trade until a profit was made.  Connolly then sent the proceeds of these trades to Englander through the CMTA process, but in the beginning claimed they had been made in error.  He eventually told Englander that the trades were in fact not mistakes.  Connolly never received the profits of these unauthorized trades; he testified that he did it in order to "prove himself" and advance at Fidelity.

In late 1996 or early 1997, Connolly's unauthorized trades began to generate multi-million-dollar losses. Connolly told Callipari about his situation and was told either to confess to Fidelity or to trade until he realized a profit. Callipari told Connolly that in the latter case, he would help find someone to take the trades. Connolly continued trading and made a $50,000 to $60,000 profit, after which Callipari arranged for JAS to take the trades. He also admonished Connolly that he was "crazy to do it again" and should "knock it off." Connolly, however, continued to place unauthorized trades, giving them either to JAS or to Englander. Like with Englander, he initially told JAS that these trades were errors.

## B. Post-Fidelity relationship between Callipari and Connolly

On April 7, 1997, Callipari was fired from Fidelity and was told by Lawrence Faulkner, executive vice president in charge of Fidelity's Equity Division, that Fidelity would "refrain" from dealing with broker/dealers and, in particular, that Fidelity would no longer deal with Rockrimmon, Andover, and JAS. At a meeting the next day with Fidelity's traders, Faulkner announced that Fidelity had eliminated Callipari's position and would no longer be dealing with his customers. Connolly's supervisors were at this meeting, but Connolly himself was not. Callipari told Connolly that he had been fired because Fidelity "didn't want to do any more business with that type of customer." Fidelity did not assign a new

representative to handle JAS's account. On April 18, 1997, Fidelity closed JAS's account in its computer system. JAS, however, was never told that it was no longer a Fidelity customer, though Kevin Arnone, a JAS executive at the time of Callipari's termination by Fidelity, testified that he assumed Callipari had left Fidelity because Fidelity was not doing business with hedge funds, which JAS is. Arnone also testified that he knew JAS could not trade with Fidelity without an authorized Fidelity representative. In any event, JAS stopped placing trades with Fidelity after Callipari's firing.

Connolly, however, continued to place unauthorized trades and send them to JAS. When he needed time to turn a profit, he let the trades "break," meaning that they arrived at Fidelity without a customer. This raised red flags at Fidelity in June 1997, but Connolly assured the Purchase and Sales Department, which investigated these unassigned trades, and Curran that he would take care of the problem. Eventually, he made a profit and sent the trades to JAS. Connolly also assured JAS that he would stop trading for them.

On July 7, 1997, Callipari entered into a trading agreement with JAS which provided that he would receive between fifty and seventy percent of all profits earned on an account of JAS which Callipari would trade. On his first day, he received an unauthorized trade from Connolly, valued at $8,750, as "a present."

When asked by Connolly whether he could continue to trade for Callipari's JAS account, Callipari said that he could, on the condition that he keep the volume "small and reasonable."  For five weeks, Connolly placed profitable and unprofitable trades directly in Callipari's JAS account.  Also, from this point, Connolly stopped using CMTA and instead had Srock give up the trades directly to JAS's clearing house, Spear, Leeds & Kellogg.  As encouragement, Callipari also told Connolly that he "had a good instinct for the OEX" and if "things went well," they could "join up" together.  Connolly believed that through his relationship with Callipari, he could one day become a trader for JAS.

At Callipari's request, Srock monitored Connolly's activities.  Srock reported Connolly's trading to Callipari by phone in addition to faxing Callipari lists of Connolly's trades.  Callipari in turn paid Srock for "clerical services."[1]  Again, Connolly usually reaped a profit for Callipari, but occasionally left him with losses in the tens of thousands of dollars.  Since Connolly did not write tickets for these trades, Fidelity never billed JAS.

From August 12 to 14, Connolly traded large amounts which resulted in a loss, although he reduced it by further trading, and

---

[1]On August 26, 1997, Srock sent Callipari a bill for $1,300 for "clerical services rendered" during July 1997, which Callipari paid.  On September 10, 1997, Callipari paid another bill from Srock for the same, this time in the amount of $1,500.

sent the trades to Callipari. On August 14, Callipari called Connolly and told him that JAS was going to call him to "protect themselves so you stop doing this." Stephen Segal, one of JAS's owners, called Connolly and told him that they were on a recorded phone line. Segal started, "We want a record of --" at which point Connolly interrupted, "You want me to just say that I'll never do it again." Segal instructed Connolly that "we do not want any more trades," to which Connolly replied, "Yes sir. On a recorded line . . . I promise I will never do it again." Connolly thereafter recounted the conversation to Callipari.

Nevertheless, the next day, Connolly placed additional trades in Callipari's account, resulting in a net profit of $57,625. Four days later, on August 19, Connolly again traded in Callipari's account, turning up a net profit of $5,937.50. The following two days, Connolly traded and lost $172,962.50. After accepting these losses, Callipari told Srock that Connolly could no longer trade in his account. Concluding that Callipari "wanted to take a break," Connolly ceased his unauthorized trading.

On August 25, Callipari withdrew $150,000 from his JAS trading account, retaining half and giving the other half to JAS, pursuant to his trading compensation agreement.

On September 9, 1997, Srock asked Connolly if he was "coming out of retirement yet" and encouraged him to return to his trading. On September 10 and 11, Connolly conducted additional

-10-

unassigned trades, with a net profit of $130,625, and convinced Callipari to take them.  By this time, Connolly had made Callipari quite a bit of money.  Between July 7, 1997, when Callipari began working for JAS, and September 12, 1997, Connolly's unauthorized trading yielded Callipari a net profit of $606,071.58.

## C.  The week of September 15, 1997

Shortly after noon on Monday, September 15, 1997, Connolly started making several large trades.  He first sold 255 put options in the Sep 900 series for a total of $302,437.50.  During the day, the S&P initially rose, making the trades profitable, but then fell, leaving the trades at a loss.  At 3 p.m., Callipari called Srock to ask about any activity in his account.  Srock replied, "little bit," and lied that the trades were "in the middle," when in fact they were losing.  Callipari warned him to "be careful."

At 3:30 p.m., Callipari called Srock again and asked, "how'd you make out?"  Srock admitted that "they're gettin' bad now."  Callipari said, "we can cover 'em tomorrow" and instructed Srock to have Connolly call him.  Later, Connolly and Callipari argued over the phone.  Connolly wanted to leave the trades open while Callipari wanted to cover them, i.e. close the trade's position by buying back the same number of options in the same series, thus ending the loss.  Connolly acquiesced and hedged by purchasing 255 options in another series--Sep 905--for $488,250.

-11-

Connolly told Srock, "It's all Richie, alright. . . . We'll be trading out of these tomorrow," and instructed him to send the trades to Callipari's account.

The next morning, Connolly undid the hedge by purchasing 255 Sep 900 puts for $205,515, leaving the Sep 905 side of the previous day's hedge exposed. He had Srock send these puts to Fidelity, where they broke without a customer. Connolly also bought 255 new Sep 900 puts and sent them to Callipari's account. Because the market had risen, the price of puts had fallen, and Connolly paid only $54,187.50 for this new set of puts. Hence, Connolly realized a $248,250 profit for Callipari on Sep 900 puts. In addition, Connolly ordered thousands of other trades, some of which went directly to Fidelity and others which he had Srock "bury" by taking the tickets home with him. By the following morning (September 17), PTR's management caught wind of these "buried" trades and ordered that all trades from Connolly must go to Fidelity from then on, and Srock had Connolly acknowledge on tape that his trades that day were for Fidelity.

Early Wednesday morning, Srock asked Connolly whether he should say anything to Callipari, to which Connolly responded, "Don't say anything to him. Fuck him." Later the same morning, Callipari called Srock and told him to call back "from downstairs"--all lines on the CBOE trading floor were recorded, but unrecorded lines were available below the trading floor. On the unrecorded

-12-

line, Callipari told Srock to sell and close a portion of the exposed Sep 905 position. Callipari complained that he "wanted [the position] covered yesterday . . . and nobody listens to me." Throughout the rest of the day, Callipari instructed Srock to sell the remaining 200 Sep 905 puts; by the end, he made only $59,937.50 on these particular sales, resulting in a net loss of $428,312.50 on the position. The $59,937.50 sale proceeds, however, were not sent to Callipari's account but instead to Fidelity, where they broke unassigned.

Later that afternoon, Callipari called Srock and asked him to find out whether he could back out of the trades that had been placed in his account that week because "they're not mine." That night, Srock admitted to Callipari what Connolly had been doing that week and they discussed placing the responsibility of the loss on Connolly.

Meanwhile, Connolly drank and smoked crack cocaine all Wednesday night and arrived at home Thursday morning. Upon learning from the news that the market "didn't look so good" that day, he stayed home and continued to "drink and use." He did not go to work that day.

Early Thursday morning, Curran contacted the Purchase and Sales Department to report the unassigned Sep 905 sales from the day before. Then, after talking to PTR and JAS, Curran spoke to Callipari, who claimed he knew nothing about the trades. Later,

-13-

Callipari called Curran back and told her that on September 15, Connolly had traded with Callipari's account, that the $488,000 loss was unauthorized, and he would not accept it. He did not mention the $248,000 gain on the Sep 900 position.

Curran later called Srock to ask what trades Connolly had put into Callipari's account that week. Srock told her about the gain, whereupon Curran advised Callipari that Fidelity could accept the loss if Fidelity also received the gain, an arrangement to which Callipari agreed. Accordingly, Fidelity paid Callipari $488,147.02 for the loss and charged him $240,425.21 for the gain. Fidelity closed Connolly's remaining trades with a net loss of $2.39 million.[2]

Early the same Thursday afternoon, Callipari spoke to Steve Wolan, another PTR clerk. Wolan told Callipari that Curran had been asking about Connolly's trading. Callipari insisted that Connolly "never did anything for me before then. . . .[H]e had an error, and he parked it my [sic] account." Wolan warned, "You can't say it never happened when it did happen. They have it on tape. If you lie, then all of a sudden you're perjuring yourself." Callipari replied that he was not lying.

---

[2]During the week, Callipari traded profitably in Sep 905 puts through his account at Vandham Securities. Late Wednesday morning, Callipari sold 255 Sep 905 puts through Vandham for $86,062.50. On Thursday afternoon, he bought through Vandham 255 Sep 905 puts for $24,843.75. Callipari never informed Fidelity of his trading through Vandham and eventually closed his Vandham account on Saturday, September 20.

That evening, Callipari called Srock at home and discussed ways to "put it all on" Connolly. Later that night through the next day, Callipari called Connolly five times, repeatedly trying to assure him that "it's going to be all right" and giving Connolly the name of a lawyer.

On Friday, September 19, Callipari called Sid Cichy, a PTR floor trader, telling him that "Fidelity is not to know the orders I've given your clerk." He warned, "I, you cannot give a tape to Fidelity of me and your clerk talking." He claimed that he had "checked with the JAS lawyer," who said the tape would not be permitted in court. Callipari continued, "[A]ny conversation between me and your clerk is between me and you, and if you give any of those tapes to Fidelity, then JAS is going to have a problem with that."

## D.  Investigations by Fidelity and the SEC

Beginning September 20, 1997, Fidelity investigated Connolly's unauthorized trading. It uncovered tickets of trades with JAS and eventually billed JAS for trades conducted from March to May 1997. In an interview with Randolph Brock, Fidelity's Senior Vice President for Operations Audit and Analysis, Callipari claimed that the September incident was the only time Connolly had made unauthorized trades, and that he and Connolly had no prior arrangement to trade. He told Brock that he had been on vacation on September 15 and 16, 1997, and had discovered unauthorized

-15-

trades in his account on September 17.  Callipari also stated that he did not work for JAS, did not know who ran JAS, and did not receive money from the JAS account.

Fidelity then turned the matter over to the SEC, which interviewed Callipari on February 11, 1998.  He stated to the SEC under oath that he paid Srock for "clerical services," that on September 15, 1997, he told Connolly to stop making trades for him, that he had not authorized any trades since the losses incurred during the August 12-14, 1997 period, and that he had neither authorized nor accepted the trades made by Connolly on September 15 and 16, 1997.

**E.  Procedural History**

On April 25, 2001, the government filed an indictment in the District of Massachusetts charging Callipari and Connolly with conspiracy to commit wire fraud, and Callipari with wire fraud and perjury.  On May 10, 2001, Connolly pled guilty pursuant to a plea and cooperation agreement.  Callipari moved to dismiss two of the wire fraud counts and the perjury counts for lack of venue, and the perjury counts on the basis that his answers were literally true. On May 7, 2002, pursuant to Fed. R. Crim. P. 48(a), the government dismissed the indictment against Callipari without prejudice, on the ground that it would bring an indictment of the same charges before a federal grand jury in the District of Rhode Island.

-16-

On July 30, 2002, that grand jury indicted Callipari in the District of Rhode Island for conspiracy to commit wire fraud, wire fraud, and obstruction of an SEC proceeding. Trial commenced on January 22, 2003. Pursuant to Fed. R. Crim. P. 29, Callipari moved for judgment of acquittal on all counts at the conclusion of the government's case. The district court denied the motion as to the conspiracy and wire fraud counts. On the obstruction count, the court granted the motion in part, denied it in part, and reserved decision in part. Callipari renewed his Rule 29 motion at the close of all evidence. On February 5, 2003, the jury convicted Callipari on all counts. The next day, the court denied both of Callipari's Rule 29 motions as to the portion of Count 12 on which it had earlier reserved its ruling. On April 28, 2003, he was sentenced to thirty months' incarceration, two years' supervised release, a $7,500 fine, and a $1,200 special assessment. This appeal followed.

II. FRAUD

## A. Requested jury instruction on apparent authority

Callipari first contends that the district court erred when it refused to instruct the jury on his defense theory: that in order to convict him of wire fraud, the government was required to prove Connolly lacked the apparent authority to trade for Callipari's JAS account and that failure to do so necessitated acquittal.

We review a district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Otero-Méndez, 273 F.3d 46, 55 (1st Cir. 2001). First, the defendant must present sufficient evidence to be entitled to a requested instruction. United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998). We review de novo the sufficiency of the evidence supporting the proposed instruction. United States v. Lopez-Lopez, 282 F.3d 1, 18 (1st Cir.), cert. denied, 536 U.S. 949 (2002); United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988). We "examine the evidence on the record and [] draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense." Gamache, 156 F.3d at 9 (emphasis added).

If the evidence is sufficient, a court's refusal to give a requested instruction is reversible error only if the instruction was "(1) substantively correct; (2) not substantially covered elsewhere in the charge; and (3) concerned a sufficiently important point that the failure to give it seriously impaired the defendant's ability to present his or her defense." United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001).

The requested instructions read:

> The government must prove beyond a reasonable doubt that Mr. Connolly lacked the apparent authority to conduct the trades. Apparent authority is distinct from actual

-18-

authority because authority need not have existed; instead, it is the belief of the third party - here, Mr. Callipari - that authority existed that is relevant.

Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on its behalf by the person purporting to act for him. . . . Information from which the third party comes to believe the apparent authority exists may come from direct statements from the principal by letter or word of mouth, authorized statements from the agent, documents or other indicia of authority given by the principal to the agent or third persons who have heard of the agent's authority in authorized or permitted communications. Appointing a person to a position that carries with it generally recognized duties or permitting someone to act in a way that establishes a reputation for so acting can create apparent authority.

In other words, according to his defense theory, Callipari could not have had the intent to defraud Fidelity if he thought that JAS was still a Fidelity customer when he authorized Connolly to trade for his JAS account, accepted all those trades made by Connolly, but eventually rejected those trades allegedly made without his knowledge or against his orders. To convict a defendant of wire fraud or conspiracy to commit wire fraud, the government must prove beyond a reasonable doubt that he acted with intent to defraud the alleged victim. United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993). Good faith is a complete defense and it is the government's burden to disprove it beyond a

-19-

reasonable doubt.  <u>United States</u> v. <u>Diaz</u>, 285 F.3d 92, 97 n.5 (1st Cir. 2002).

We need not decide whether sufficient evidence supported the instruction because as requested by Callipari, the instruction was a substantively incorrect red herring.  With regard to what constituted a "scheme to defraud," the court instructed in accordance with the indictment:

> [T.J.] Connolly would engage in unauthorized trading in index options and other securities, using his position on the Fidelity options trading desk to execute the trades;
> The conspirators would conceal from Fidelity Connolly's unauthorized trading;
> If the trades were successful, and made a profit, Connolly would direct the trades to Callipari's JAS account; and
> If the trades were unsuccessful, and resulted in a loss, Callipari could always reject the trades, which would result in Fidelity incurring the loss on the trades, since they had been initiated by Fidelity's employee (Connolly), using Fidelity's trading facilities.

The court defined "defraud" as "depriv[ing] another of something of value by means of deception or cheating" and "intent to defraud" as "act[ing] willfully and with the specific intent to deceive or cheat, or for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself."  The court also instructed, "Thus, if the defendant acted in good faith, he cannot be guilty of the crime."

Callipari claims that "the lynchpin of the government's case, as stated in the Indictment and its opening and closing arguments, was that he 'knew that JAS was no longer a Fidelity customer who could authorize trades' when Connolly traded for his JAS account." Callipari contends that the government stuck to this theory throughout trial and in response, one of the defense's central claims was that he believed JAS had been reinstated by Fidelity as a customer.

The government, on the other hand, counters that Callipari "misstates the nature of his fraud." The broader prosecution theory, the government argues, was that Callipari "'did not reject trades made . . . against his orders,' but rather authorized Connolly to trade for him, then rejected Connolly's unprofitable trades by falsely claiming that the trades were made against his orders." It follows that "[e]ven if Callipari had been a Fidelity customer, those actions would have constituted fraud." Throughout trial and highlighted in its summation, the government presented this theory of the fraudulent scheme to the jury.

Though the issue of Callipari's awareness of JAS's status with Fidelity was hotly contested throughout, it was only one of several foci and certainly was not the sole "lynchpin" of the prosecution. "A jury need not believe that the defendant did everything the indictment charges; it may convict if it believes he did some of the things the indictment charges and if those things,

-21-

by themselves, amount to a violation of the statute[,]" provided that the indictment "enable[s] the accused to know the nature and cause of the accusation against him." United States v. Doherty, 867 F.2d 47, 55 (1st Cir. 1989) (internal quotation marks omitted). The indictment here satisfied this notice requirement. Moreover, "a part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored." United States v. Ayala, 289 F.3d 16, 22 (1st Cir. 2002) (quoting United States v. Miller, 471 U.S. 130, 136 (1985)).

Callipari, if he truly had been a customer of Fidelity, may have had the right to reject trades, including unprofitable ones, if he had not authorized them. He, however, did not have that right and was legally prohibited from "free-riding" off Fidelity: concealing trades from Fidelity, claiming unprofitable trades were unauthorized and demanding that Fidelity take them back, but accepting those trades that turned a profit. The factual issue of whether he knew about JAS's status with Fidelity was not necessary to a conviction for fraud and conspiracy to defraud. "Even false statements or omissions of a material fact do not constitute a violation of the [wire] fraud law unless made with an intent to defraud." United States v. Bradstreet, 135 F.3d 46, 51 (1st Cir. 1998). Here, however, the government proved that requisite intent beyond a reasonable doubt not just by presenting

evidence and arguing that Callipari knew JAS was no longer a Fidelity customer, but, more critically, that Callipari knew he was acting illegally when he sent back as "unauthorized" trades he had sanctioned.

Pinning his appeal on the issue of apparent authority misses the core and extent of the fraud alleged in the indictment and argued at trial by the government. In its closing argument, the government emphasized evidence of the incipient unauthorized trades running from late 1996 through April 1997 and what the government characterized as sham attempts by Callipari to stop Connolly's trading. It also highlighted evidence of Callipari's authorization of the September 1997 trades, Callipari's statements to Brock, as well as his phone conversations with PTR clerks during the week of September 15, 1997 as the scheme began to implode. All of this evidence was aimed at proving Callipari's part in a conspiracy to conceal certain trades and return losing ones as "unauthorized," independent of the allegation that he knew JAS was no longer a Fidelity customer.

The defense itself appeared to have recognized this prosecution theory. For instance, Callipari argued in closing that his collaboration with Connolly during the late 1996-April 1997 period was a one-time deal. Moreover, he strenuously claimed that he ordered Connolly to stop trading, that he did not authorize the September 15, 1997 trades, and that he was entitled to return those

trades because Connolly had acted without his knowledge and against his orders.  These arguments were aimed at rebutting the notion that Callipari sanctioned and hid the September trades from Fidelity, only to unearth them as "unauthorized" upon realizing large losses and upon Fidelity's discovery of the unassigned trades involved in the scheme.  Allegations as to Callipari's knowledge of JAS's status with Fidelity were "surplusage" within this fraudulent scheme contemplated by the indictment and by both the government and defense throughout trial.  Ayala, 289 F.3d at 22 (quoting United States v. McVeigh, 153 F.3d 1166, 1196 (10th Cir. 1998)).

Hence, we conclude that the district court did not abuse its discretion in denying Callipari's requested jury instruction on apparent authority.  Even if Callipari could have convinced the jury that he believed himself and JAS to be Fidelity customers, the jury was not required to acquit him.

## B.  Cross-examination and closing

The government, one month before trial, filed a motion in limine, arguing that (1) evidence of what Fidelity knew or should have known should be excluded because it was "not a defense that Fidelity could have prevented the fraud"; (2) evidence that Fidelity knew about the fraud would be irrelevant; and (3) that even if such evidence was relevant, its prejudicial effect on the government's case outweighed its probative value.  In his opposition to the motion, Callipari contended that (1) evidence

-24-

that Fidelity knew or should have known that Connolly was trading for Callipari's JAS account would show that Callipari's belief to that effect was reasonable and therefore held in good faith; (2) evidence that Fidelity employees knew Connolly was trading for JAS would disprove the allegation that the trading was "unauthorized" because Callipari knew JAS was not a Fidelity customer; and (3) that evidence of Fidelity's employees' failure to supervise Connolly in accordance with securities laws would show bias on their part, and was thus admissible. The district court made no ruling on the motion before trial.

During trial, the court limited cross-examination of Curran and other Fidelity employees regarding the circumstances of Connolly's trades, their knowledge of those trades, as well as opportunities and duties to investigate Connolly's behavior. During the unrecorded February 2, 2003 charge conference, the court warned that if the defense included in its closing argument any claim of what Fidelity knew or should have known, it would give the government's requested supplemental instruction entitled "Victim Carelessness No Defense."[3]

---

[3]That instruction reads:

"It is not a defense to the crime of wire fraud, or conspiracy to commit wire fraud, that the victim institution, Fidelity Investments, could have done something more than it did to prevent the offense. In other words, if you find that the government has proved all the elements of wire fraud, or conspiracy to commit wire fraud, beyond a reasonable doubt, it is no defense that such fraud or conspiracy might not have occurred if Fidelity had better

A defendant has a Sixth Amendment right to effective cross-examination of key adverse witnesses. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); U.S. Const. art. VI. Trial judges, however, "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. "The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).

It is reversible error to preclude such cross-examination if the court either relied on "an incorrect legal standard" or "made a clear error in judgment . . . based upon a weighing of the relevant factors." United States v. Shay, 57 F.3d 126, 132 (1st Cir. 1995). "Confrontation clause challenges are reviewed de novo to determine whether defense counsel was afforded a reasonable opportunity to impeach adverse witnesses; once that threshold is

_____

internal controls or had acted with greater care. Therefore, any evidence that Fidelity could have done something to prevent any fraud or conspiracy which you find occurred, or evidence that Fidelity's procedures were somehow deficient, should not be considered by you as an excuse or defense to any wire fraud or conspiracy to commit wire fraud which you find has been proven beyond a reasonable doubt."

-26-

reached, the trial court's restrictions on the extent and manner of cross-examination are reviewed only for abuse of discretion." United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st Cir. 2000) (internal quotation marks and citations omitted); Brown v. Powell, 975 F.2d 1, 5 (1st Cir. 1992). In particular, restrictions on cross-examination regarding bias are erroneous only if they are "manifestly unreasonable or overbroad." United States v. Gomes, 177 F.3d 76, 81-82 (1st Cir. 1999). Finally, "[t]o establish that the district court has abused its discretion, the defendant must show that the limitations imposed were clearly prejudicial." United States v. Anderson, 139 F.3d 291, 302 (1st Cir. 1998) (quoting United States v. Williams, 985 F.2d 634, 639 (1st Cir. 1993)). "It follows logically, therefore, that should an error be revealed, we may affirm the conviction if we are confident that it was harmless beyond a reasonable doubt." Id. (quoting Van Arsdall, 475 U.S. at 681).

### 1. Defense theory

The court limited questioning and argument on the above issues because it concluded that Callipari was trying to "blame the victim" and suggest that Fidelity was defrauded because it had been careless. The court allowed some questioning of Curran concerning the fact that she sat next to Connolly and was his supervisor. She also testified as to her knowledge of Connolly's substance abuse. The court restricted cross-examination of Curran as to whether she

-27-

knew Connolly was lying about the nature of trades he made in June 1997. It also limited cross-examination on what Callipari claims was her "lack of diligence" in accepting Connolly's assurances in June 1997 that he had resolved problems with unassigned trades, a similar negligence in not reporting Connolly to her superiors during the same time, and about whether she thought anything appeared to be wrong with Connolly during the week of September 15, 1997. The court also restricted the defense's inquiry of Curran's supervisor, Joseph Valenza, on what measures Fidelity had in place to prevent Connolly from entering a trade for his own benefit, and of Brock on what attempts he had made, if any, to determine the veracity of statements made to him by Callipari during Fidelity's September 1997 investigation. Finally, the court forbade Callipari from examining Connolly about Fidelity's knowledge of his own substance abuse.

Callipari claims that information he would have elicited from the above inquiries was essential to his good faith defense, since it would have tended to prove that if he reasonably thought Fidelity knew Connolly was trading for JAS, he could also reasonably believe that Connolly had authority to trade for JAS.[4]

---

[4]Callipari also contends that the district court erroneously excluded from evidence a bill sent by Fidelity to JAS in November 1997 for trades conducted by Fidelity between April 7, 1997 and May 8, 1997. The bill was sent two months after discovery of the fraud; hence, it has minimal if not zero relevance to Callipari's intent or to Curran's purported bias. Moreover, Kevin Arnone, JAS's then-CFO, testified at trial as to the contents of the bill.

With respect to the "free-riding" scheme of the week of September 15, 1997, Callipari argues that the jury could infer that despite being told in April 1997 by Faulkner that Fidelity would refrain from dealing with JAS, it appeared to Callipari that by July 1997, JAS had been reinstated as a Fidelity customer. According to this theory, Callipari then was within his rights as a Fidelity customer to demand Fidelity to take back the September trades.

The government characterizes the defense's theory as follows: the jury could have found good faith only if it concluded that Fidelity employees had the duty and opportunity to learn about Connolly's trades and then inferred that Callipari knew about that duty and opportunity; then, that Callipari believed, without any inquiry, that Curran knew Connolly was trading for him; and further, that he believed JAS remained or had been reinstated as a Fidelity customer. The government argues that the jury would have had to make one final, "even more remote" inference: that Callipari did not authorize Connolly's September 15, 1997 trades and return them to Fidelity under the false pretense that he had never authorized them.

The district court's handling of cross-examination on the above issues was based on two concerns: repetition and confusion. Given strong and competing evidence of Faulkner's explicit statement to Callipari that Fidelity would no longer do business with JAS, Connolly's known history of unauthorized trading, and

-29-

Callipari's attempts to hide Connolly's trading from Fidelity, the court exercised its "wide latitude under the Sixth Amendment to limit repetitive or marginally relevant cross-examination." United States v. Perez-Montanez, 202 F.3d 434, 440 (1st Cir. 2000). The court also recognized that delving far into alleged failures by Fidelity employees to police Connolly would have misdirected the jury. We stress that the court did not wholly exclude such cross-examination, but only stopped it short when it determined that further inquiry was repetitive or would lead the jury astray. The court was well within its discretion to exclude evidence suggesting that Fidelity, rather than Callipari and his co-conspirators, was to blame for the loss.[5]

Again, the court allowed cross-examination of Curran with regard to the following: her proximity to Connolly at the Fidelity trading desk; her ability to observe Connolly from her vantage point; what she knew about Connolly's alcohol and drug abuse; what she knew about the termination of JAS's account at Fidelity; her status as a supervisor; her knowledge of the June 1997 trades and what steps she took to investigate them; whether she knew Connolly was trading for Callipari; whether she knew about Connolly's

---

[5]That Connolly's supervisors should have been aware of Connolly's improper trades is not a defense to committing wire fraud and conspiracy to wire fraud. United States v. Brien, 617 F.2d 299, 311 (1st Cir. 1980); see also United States v. Moore, 923 F.2d 910, 917 (1st Cir. 1991) (not a defense to fraud that a corporate victim had insufficient internal controls or procedures to prevent the fraud).

trading on September 10, 1997; and whether she found Connolly's behavior unusual during the week of September 15, 1997. The defense cross-examined Valenza on whether Fidelity had adequate procedures to track certain options trades, though the court precluded questioning on what checks Fidelity had in place to prevent options traders from trading for their own benefit.

Given the substantial cross-examination of Fidelity employees the court allowed Callipari to conduct, we cannot say that the court failed to afford Callipari a reasonable opportunity to cross-examine government witnesses on his purported defense theory. Nor was it an abuse of discretion for the court to restrict further cross-examination on the well-founded concern that suggestions of "blaming the victim" might turn into a "fishing expedition" that would confuse the issues for the jury and unfairly prejudice the government's case. United States v. Zaccaria, 240 F.3d 75, 81 (1st Cir. 2001); United States v. Mulinelli-Navas, 111 F.3d 983, 988 (1st Cir. 1997); Fed R. Evid. 403. On the same basis, we find no abuse of discretion by the district court in declining to allow further cross-examination with a limiting instruction telling the jury for what purposes the evidence elicited could and could not be used. See Miller v. Town of Hull, Mass., 878 F.2d 523, 529 (1st Cir. 1989).

## 2. Bias

We can only conclude the same with respect to Callipari's other assertion that the district court erred by forbidding him to cross- examine Curran and other Fidelity employees for bias, positing that they feared potential discipline for failing to adequately supervise Connolly and thus had motive to claim ignorance of Connolly's activities in their testimony. Callipari argues that Curran's acceptance of Connolly's explanation of the June 1997 trades and "failure" to take action with respect to Connolly's substance abuse amounted to "a textbook case of failure to supervise" and exposed her and Fidelity to severe penalties. Accordingly, Callipari contends, had the court allowed cross-examination on Curran's duty to supervise and the consequences of a failure to carry out that purported duty, the responses "would have a tendency to make the facts to which [she] testified less probable in the eyes of the jury than it would be without such testimony," quoting United States v. Abel, 469 U.S. 45, 51 (1984).

To meet the constitutional standard, the district court "must ensure that the jury is provided with 'sufficient information concerning formative events to make a "discriminating appraisal" of a witness's motives and bias.'" United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988) (quoting United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986) (quoting United States v. Campbell, 426 F.3d 547, 550 (2d Cir. 1970))). "In the usual case, 'if the jury

-32-

had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness,'" we need not inquire further. United States v. Anderson, 139 F.3d at 302 (quoting United States v. Tracey, 675 F.2d 433, 437 (1st Cir. 1982)).  The Confrontation Clause does not give a defendant the right to cross-examine on "every conceivable theory of bias."  Bui v. DiPaolo, 170 F.3d 232, 242 (1st Cir. 1999).  The court may limit cross-examination if the defendant is unable to lay a proper evidentiary foundation.  Where the theory of bias is "inherent[ly] speculative[]," the court may "prohibit[] cross-examiners from mounting fishing expeditions." Id. at 244.  Without such limits, unchecked cross-examination on a theory of bias may unfairly prejudice the opposing party's case and only bring forth "marginally relevant" evidence.  Van Arsdall, 475 U.S. at 679.  Again, erroneous restrictions on examination are reviewed for harmlessness.  Id. at 684.

Callipari's concern with Curran was that her testimony, along with that of other Fidelity witnesses, provided the circumstantial evidence from which the jury could infer that Callipari knew that JAS was not a Fidelity customer because Curran testified that JAS was not in fact a customer and that she had no knowledge of any trading with JAS after Callipari's departure from Fidelity.  We stress yet again that this theory misses the nature and extent of the fraud alleged and proven by the government.

-33-

Regardless, we conclude that the constitutional threshold was met here, as the jury had sufficient other information before it to make a "discriminating appraisal" of any bias on the part of Curran. As to supervisory duties, the court allowed enough cross-examination of Curran to inform the jury that "as part of [her] duties and obligations," she had to "make sure [people she was supervising] were trading appropriately," which "includ[ed] having customers for the trades that they were placing." The defense also examined Curran about the two securities exams she had taken and passed, specifically for licenses to supervise general securities and options trading. The court stopped the examination short when defense counsel asked whether "duties" imposed by these licenses "motivated the steps that [she] took on September 18, 1997." After the court sustained the government's objection, the defense elicited from Curran a detailed account of how she responded to the suspicious trades of September 15, 1997; it proved to be no different from what she had testified to on direct examination.

The record reveals that Callipari was given ample room to impeach Curran's testimony otherwise. We therefore find no error in this single limitation on the content of Curran's purported supervisory duties and the potential consequences of not carrying them out. Allowing cross-examination on these subjects would have posed the danger of confusing the issues for the jury rather than suggesting any bias or improper motivation by Curran. Moreover,

-34-

the connection with bias is remote, as the SEC had already closed its investigation and Curran would soon leave Fidelity after trial to raise her children. There was no identifiable threat of prosecution or penalty from either the government or Fidelity. See Gomes, 177 F.3d at 81.

### 3. Closing argument

Callipari asserts that the district court compounded its errors by threatening to give the government's "Victim Carelessness No Defense" instruction if he made any argument regarding what Fidelity knew or should have known about Connolly's behavior. First, we note that the instruction itself is not erroneous. See supra note 4. In any event, the court did not give the instruction.

At trial, Callipari did not object to the court's restriction of his closing argument. Hence, we review the restriction for plain error, see United States v. Grabiec, 96 F.3d 549, 552 (1st Cir. 1996), requiring Callipari to "show an obvious and clear error under current law that affected his substantial rights." Id. (omitting internal quotation marks and citation). Trial courts have broad discretion over the scope of summations, especially to "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." Herring v. New York, 422 U.S. 853, 862 (1975). The court's purpose in warning Callipari was to focus the trial on the

central issue of fraudulent intent. As much as Callipari claims that questions of Fidelity's duty to know are relevant to a defense theory of good faith, the court did not transgress its discretion in limiting, but not wholly excluding, such inquiry in order to assure the jury's correct and complete comprehension of the case. Also, given that throughout trial, the district court properly and correctly forbade any argument on Fidelity's duty to know, we find no error, let alone plain error, with its admonition to defense counsel regarding closing argument.

III.  OBSTRUCTION

The obstruction statute under which Callipari was convicted provides, in relevant part:

> Whoever corruptly, . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1505. We first address Callipari's claim of error regarding the court's instructions to the jury on the obstruction count.

**A.  Requested jury instruction on "natural and probable effect"**

Callipari's Requested Instruction No. 45 read:

> To prove that Mr. Callipari acted "corruptly," the government must establish, beyond a reasonable doubt, that his actions were prompted by an improper motive, or an evil or wicked purpose, having decided in his mind

-36-

what he would do and that he then did something the law prohibits. The government also must prove that his actions were purposeful and that his conduct had the natural and probable effect of obstructing the investigation.

In his written request, Callipari relied on <u>United States v. Aguilar</u>, 515 U.S. 593, 600 (1995), for the proposition that his conduct must have had "the natural and probable effect" of obstructing the SEC investigation. The district court instructed the jury that in order to find Callipari guilty of obstruction of the SEC investigation, it had to find he acted "corruptly," which was defined as "having an improper motive or purpose of obstructing the proceeding," and that to prove Callipari acted corruptly, "the government must prove beyond a reasonable doubt that his actions were prompted by an improper motive to do something the law prohibits." After the court gave the charge, Callipari objected out of the jury's hearing, "With respect to 'corruptly,' the intent element on the obstruction charge, we do request that the evil or wicked bad purpose instruction that's been--that was Defendant's Request Number 45 and in the case law that's cited there be given as part of that instruction." In this objection, no mention was made of the "natural and probable effect" component. The court declined the request and responded that its instruction reflected "the current statement of the law in the First Circuit."[6]

_____

[6]In addition to the objection Callipari made after the court had charged the jury, he claims that he alerted the court to

The government contends that the court's denial of Callipari's Requested Instruction No. 45 should be reviewed for plain error because he did not object "distinctly" or "specifically" enough, as required by Fed. R. Crim. P. 30, to preserve the issue.[7] Objections are not distinct if they merely

_____

Aguilar and his request for the "natural and probable effect" language during the February 3, 2003 charge conference, held the day before the actual charge. As was the practice of the court, the conference was not recorded. Callipari claims that the court explicitly "rejected that portion of Request No. 45 relating to natural and probable effect." He also recalls that he directed the court's attention to Aguilar for the proposition that the court was required to instruct that his conduct must have had "the natural and probable effect" of obstructing the SEC investigation. The government counters that neither the "natural and probable effect" portion of the requested instruction nor Aguilar (or any other precedent for Callipari's assertion) was mentioned by either party during the charge conference.

In response to Callipari's motion for a statement of proceedings pursuant to Fed. R. App. P. 10(c), the district court, in a Memorandum and Order dated December 11, 2003, admitted that it had "no recollection of either the Government's or the Defendant's version of what was discussed regarding Aguilar or the 'natural and probable effect of obstructing the investigation.'" The court agreed with Callipari that during the charge conference, it "indicated the appropriate analysis is limited to the defendant's purpose, not any effect, and thus rejected that portion of Request No. 45 relating to natural and probable effect."

This explanation still leaves us uncertain. Fortunately, we need not inquire further into the facts of the unrecorded charge conference to decide whether the court's refusal to include the "natural and probable effect" language merits reversal. For reasons made obvious by this case, however, we encourage district courts, in exercising their discretion whether or not to record charge conferences, to consider the difficulties that non-recordation may engender.

[7]Fed. R. Crim. P. 30 was amended on December 1, 2002, before the commencement of Callipari's trial. The old rule required objections to be stated "distinctly" while the new rule requires a "specific objection." The Advisory Committee Notes suggest that

incorporate arguments in the charge conference by reference.  See United States v. Gabriele, 63 F.3d 61, 66 (1st Cir. 1995).  The objecting party must state the grounds for the objection; uttering "objection" is not enough.  United States v. O'Connor, 28 F.3d 218, 220-21 (1st Cir. 1994); United States v. Wilkinson, 926 F.2d 22, 26 (1st Cir. 1991).

The amended rule does not affect the old rule's warning that it cannot be "satisfied by counsel's pre-charge colloquy with the court or written explanation of grounds alone, nor even by a post-charge attempt to incorporate by reference earlier arguments." Fed. R. Crim. P. 30(d) (amended 2002); Advisory Committee notes on 2002 amendments ("No change in practice is intended by the amendment.").  In his objection, Callipari mentioned only the "evil or wicked bad purpose" component of his requested instruction.  He did not cite the language to which he now assigns error; nor did he specifically mention Aguilar or any other precedent supporting an

---

the amendment is "part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules."  Advisory Committee Notes on 2002 amendments.  The Notes specifically state that the amendment does not change the practice of objecting after the court gives its instructions as well as the clarity required of counsel in making an objection.  Id.  The one substantive area affected by the amendment is that the Rule now provides for plain error review of an issue not preserved, whereas previous versions were sometimes read to preclude such review.  Id.  ("As the Supreme Court recognized in Jones v. United States, 527 U.S. 373 (1999), read literally, [old] Rule 30 could be construed to bar any appellate review absent a timely objection when in fact a court may conduct a limited review under a plain error standard.").

instruction containing the "natural and probable effect" language. When the court replied that its "corruptly" definition was the correct statement of the law, it likely was referring to the words Callipari proffered in his objection, and was not aware, because it was not made aware, of the "natural and probable effect" language.[8]

We need not decide, however, whether Callipari preserved his objection. Even assuming the district court erred in refusing to include the "natural and probable effect" language in its

---

[8]In response to the panel's inquiry at oral argument regarding the effect of the amended Rule 30, Callipari argues that Fed. R. Civ. P. 51 has been interpreted as precedent for Fed. R. Crim. P. 30 and that the former, as amended in 2003 and described in the following excerpt from the 2003 Advisory Notes, applies here:

> Many cases hold that a proper request for a jury instruction is not alone enough to preserve the right to appeal failure to give the instruction. The request must be renewed by objection. This doctrine is appropriate when the court may not have sufficiently focused on the request, or may believe that the request has been granted in substance although in different words. But this doctrine may also prove a trap for the unwary who fail to add an objection after the court has made it clear that the request has been considered and rejected on the merits. [Rule 51] establishes authority to review the failure to grant a timely request, despite failure to add an objection, when the court has made a definitive ruling on the record rejecting the request.

Advisory Committee Notes on 2003 amendments. The government's response to the analogy suffices: the charge conference and the district court's ruling on Callipari's request at the charge conference were not "on the record."

charge, the error is harmless and is not cause for reversal. United States v. Blastos, 258 F.3d 25, 27 (1st Cir. 2001).

Under the harmless error standard, we ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (quoting Neder v. United States, 527 U.S. 1, 15 (1999)) (internal quotation marks omitted). To answer this question, we first turn to Aguilar, where the Supreme Court held that another obstruction statute, 18 U.S.C. § 1503, requires proof that the defendant's actions have the "natural and probable effect" of obstructing an investigative proceeding--in essence, a "nexus" between the actions and the proceeding. 515 U.S. at 599-600. Other circuits have required the same showing for § 1505. See United States v. Senffner, 280 F.3d 755, 762 (7th Cir.), cert. denied, 536 U.S. 934 (2002); United States v. Hopper, 177 F.3d 824, 830-31 (9th Cir. 1999). We have characterized § 1505 as a sister provision to § 1503.[9] United States v. Brady, 168 F.3d 574, 578 (1st Cir. 1999).

Callipari included the "natural and probable effect" language as part of his request for a definition of "corruptly." The government contends that in § 1505 cases decided since Aguilar

---

[9]The relevant provisions from the two statutes are nearly identical. The only difference is what type of proceeding the defendant is obstructing. Section 1505 covers obstruction of proceedings before Congress or a federal agency. The "Omnibus Clause" of § 1503, which was the focus of Aguilar, applies to obstruction of "the due administration of justice" in the federal courts.

(and Aguilar itself for § 1503 prosecutions), courts have held that the government must show that the "endeavor" to obstruct a government proceeding must have had a "natural and probable effect" of interfering with the proceeding. Senffner, 280 F.3d at 762; Hopper, 177 F.3d at 830-31. None of these courts, however, went as far as to assert that "natural and probable effect" specifically modified "endeavor" as opposed to articulating a general requirement that the government show an obstructive "nexus" between the defendant's actions and the proceeding. In any event, the law in this circuit is not clearly settled on whether the government must prove a "nexus," and if so, how the requirement must be articulated in a jury charge.[10]

The district court here appeared to have concluded that the "nexus" requirement was better couched in its instruction on "endeavor":

> The word "endeavor" means any effort or any act, however contrived, to obstruct or interfere with the proceeding. It is the endeavor which is the gist of the crime. Success of the endeavor is not an element of the crime. The term "endeavor" includes conduct which is aimed at influencing, intimidating or impeding the proceedings.

(emphasis added). Indeed, this instruction reflects the Supreme Court's basic concern that, "if the defendant lacks knowledge that his actions are likely to affect the [] proceeding, he lacks the

---

[10]It is our belief that the better practice would be to include the "natural and probable effect" language in the instruction.

-42-

requisite intent to obstruct" and that "the act must have a relationship in time, causation, or logic with the [] proceedings." 515 U.S. at 599 (citations omitted); see also Senffner, 280 F.3d at 762; Hopper, 177 F.3d at 830-31. The instructions, read collectively, adequately informed the jury that the government had to prove a "nexus" between Callipari's acts and the SEC proceeding. See Gomez, 255 F.3d at 39.

Moreover, the SEC was investigating precisely the topics on which Callipari testified during his interview with the SEC, most significantly who was responsible for Connolly's trades. He was aware that an investigation was underway, testified as part of that investigation, and very well knew the nature and objective of the investigation. Aguilar, 515 U.S. at 599 (suggesting that knowledge of a pending judicial proceeding confers an intent to obstruct). Since the jury found him guilty of the conspiracy and at least for making false or misleading statements as to the obstruction count, Callipari is hard pressed to argue that the jury would not have convicted him of obstruction had the court given his Requested Instruction #45. Accordingly, even assuming the district court erred in declining to include the "natural and probable effect" language, the error was harmless.

## B. Sufficiency of the evidence

We now turn to the district court's denial of Callipari's motion for judgment of acquittal on the obstruction count. We

review Rule 29 determinations <u>de</u> <u>novo</u>. <u>United States</u> v. <u>Moran</u>, 312 F.3d 480, 487 (1st Cir. 2002). More specifically, we evaluate the evidence in a light most favorable to the government, and "decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." <u>Gomez</u>, 255 F.3d at 35; <u>United States</u> v. <u>Czubinski</u>, 106 F.3d 1069, 1073 (1st Cir. 1997). "The government may prove its case entirely by circumstantial evidence and need not exclude very reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt." <u>United States</u> v. <u>Waldeck</u>, 909 F.2d 555, 559 (1st Cir. 1990).

Count Twelve in the indictment charged that nine portions of Callipari's SEC testimony were false and misleading. The district court granted Callipari's Rule 29 motion with regard to his statement concerning his termination from Fidelity, and denied the motion with regard to the remaining eight statements, which concerned his payments to Srock and detailed Connolly's authority to trade for his account. We review these eight portions of the testimony.[11]

---

[11]All eight need not survive our review. When a jury returns a general verdict of guilty on a single count charging more than one act, we must sustain the verdict as long as the evidence was sufficient to support at least one of those acts. <u>Griffin</u> v. <u>United States</u>, 502 U.S. 46, 56-57 (1991); <u>United States</u> v. <u>Nieves-Burgos,</u> 62 F.3d 431, 434-36 (1st Cir. 1996). The district court's instruction was consistent with this rule. Moreover, the evidence

1. <u>Relationship with Srock</u>

Callipari testified to the SEC,

Q. Did you have any monetary relationship with Srock?
A. I paid Srock for clerical services. He sent me a bill and I - and that's not unusual because of the heavy volume on the floor. He was, you know, checking all the trades in the morning, I paid him.
Q. And -
A. He sent me a bill.
Q. Do you pay Srock or PTR?
A. I pay Srock for that.
Q. Do you have a written agreement?
A. No. He sent me a bill, I paid for it.
Q. What was the agreement?
A. He basically said, you know, he had to come in real early because of all these trades and, you know, there was a lot, you know, there was a lot of work involved in the morning clearing everything because we were very busy. And that, you know, if I could give him some money, I said, "Fine, send me a bill and I'll pay you."

The indictment specified that this statement was false or misleading because Callipari knew that "it was highly unusual to be paying Srock directly," "the payments were for Srock to keep an eye on Connolly's trades, and make sure they were not too large," and "the payments to Srock were not for Srock to perform duties for Callipari in the morning in connection with clearing trades," but for Srock to make sure Connolly did not "go crazy."

As for the first allegation, Srock testified that he did not send invoices to anyone but Callipari because he did not

here is sufficient to justify conviction on all eight of the acts submitted to the jury. <u>See</u> text <u>infra</u>.

-45-

perform "additional duties" for other clients. Three other witnesses--Stephen Wolan, another PTR clerk; Richard Polcari, a trader at Vandham Securities; and Joe Valenza-testified that customers did not pay floor clerks directly for their services, even if the clerks performed certain extra duties for these customers. Customers negotiate contract adjustments and pay the executing firm for this extra work.

As relevant to the second and third allegations, Srock testified that throughout July 1997, Callipari asked him to monitor Connolly's trading and that, later, he admonished Srock "to not let Connolly go crazy."[12] Srock regularly sent Callipari "trade cards" on which Srock detailed the types and amounts of trades in which Connolly engaged. In comparing it to Callipari's SEC testimony, the jury could reasonably infer from Srock's trial testimony that Callipari was fully aware of Connolly's potential to make excessive trades and accordingly hired Srock, through whom Connolly conducted the trades, to keep an eye on Connolly. The two even had a system in place by which Callipari could track Connolly's activities. The "clerical work"--preparation and faxing of lists detailing Connolly's trades--was part and parcel of this system. The record

---

[12]That Srock believed the size of Connolly's trades was not "initially" relevant to his agreement with Callipari does not mean that the jury could not have reasonably concluded that Callipari himself was worried about what Connolly was capable of doing. Otherwise, it is difficult to imagine why Callipari struck an agreement with Srock specifically to monitor Connolly's trades.

amply supports the conclusion that Callipari's stated reason for the payments to Srock—clearing trades in the morning--was aimed at misleading and impeding the SEC in its investigation.

2. <u>Relationship with Connolly and authority over trades</u>

The remaining seven portions of Callipari's SEC testimony listed under Count 12 (see Attachment) deal with the week of September 15, 1997, and Callipari's contention that he told Connolly "no trading" for that week. His recorded conversation with Srock on the afternoon of that Monday, however, belies his claim and gave the jury more than enough reason to find his statements to the SEC obstructive. Callipari neither expressed surprise at the activity in his account nor rejected any trades when Srock told him about them on Monday afternoon. Instead, he inquired of Srock whether these trades were profitable. Additionally, by the fact that Callipari intimated to Srock that he would later call Connolly, the jury could easily infer that Callipari knew these trades had been made by Connolly as part of the conspiracy and that he never prohibited Connolly from trading in his JAS account.

Callipari also testified to the SEC that, when he learned of Connolly's trading on Monday, he told Connolly that he refused the trades and that those trades marked the end of their business relationship. Connolly, however, testified at trial that Callipari

ordered him to take a position on another series of options in order to hedge against losses.

Finally, Callipari stated that he had not authorized any of Connolly's trades after the August 14, 1997 incident. Connolly nevertheless placed trades in Callipari's account all throughout the latter half of August. And again, Callipari accepted Connolly's September 15 and 16 trades into his account and then tried to "free-ride" by demanding that Fidelity take back as "unauthorized" the big losing trade of that week.

Considering the totality of the record, and the inferences to be drawn therefrom in the light most favorable to the verdict, we affirm the district court's denial of Callipari's motions for judgment of acquittal.

IV. SENTENCING

At sentencing, the district court attributed $428,000 to Callipari, which was the total loss Connolly incurred from trading on Monday, September 15 and Tuesday, September 16, 1997. The court stated, however, that Callipari was responsible only for the amount which had been lost on Monday, which Callipari claims was only $87,000. The government contends that the court properly determined the amount to be $428,000.

A sentencing court's valuation of loss is reviewed for clear error. United States v. Henry, 136 F.3d 12, 23 (1st Cir. 1998).

To recapitulate, Connolly made two large trades during the week of September 15, 1997. On the morning of Monday the 15th, Connolly sold 255 put options in the Sep 900 series for a total of $302,437.50. On Monday afternoon, Connolly hedged the morning trade by purchasing 255 put options in the Sep 905 series for $488,250.00. He "undid" the hedge Tuesday morning by buying back 255 put options in the Sep 900 series. Throughout Wednesday, Callipari himself sold the Sep 905 puts through Srock, which had been exposed to market risk by the "undoing" of the hedge, for $59,937.50, resulting in a loss of $428,312.50. As for the other large trade, Connolly made a $248,250 profit on the purchase of another set of Sep 900 puts and sent it to Callipari. The net loss on the two trades was $180,062.50 ($428,312.50 loss offset by the $248,250.00 profit). Callipari's $87,000 figure comes from what the net loss would have been had he and Connolly closed the positions on both trades at the end of the day on Monday. Accordingly, he argues, he should be sentenced only for the loss that "occurred" on Monday.

At sentencing, the court concluded that in ordering Connolly to hedge,

> Callipari was really attempting to limit the losses here, not necessarily out of any regard for Fidelity, but for his own situation because once those losses became so great that even he couldn't take them or pass them off to JAS or any of the other parties who were involved in these transactions, the game was going to be up, and he clearly knew that.

The court continued,

> I believe that the evidence in the case shows that he thought that was the end of it.  And while he may have had some feelings that Connolly would go off and continue doing the kinds of trading that he did over the next two days, I do not believe the Government has sustained its burden with respect to the total amount of loss here, that is, the $2.39 million. . . . [W]hen Connolly the next day decided on his own to pull that leg off and then, as he said, went nuts, he kept Callipari in the dark, I think that the appropriate loss figure here is the $428,000 loss figure at the end of the day on Monday . . . but to try to offset it with the profits that were made on the other transactions just doesn't cut it because those weren't given back until the conspiracy was pretty much uncovered by Ms. Curran.

Callipari suggests that from these observations, the court itself agreed with his theory that the cause of the increase in loss from $87,407.91 on Monday to $428,000 on Wednesday was Connolly's "affirmative and unilateral act of removing" the hedge Tuesday morning.

Under § 1B1.3 of the sentencing guidelines, "relevant conduct" for sentencing purposes includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. § 1B1.3(a)(1)(A).  In the case of a conspiracy, the court may consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" in determining a sentence.

Id. § 1B1.3(a)(1)(B).  In addition, "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions" constitutes "relevant conduct."  Id. § 1B1.3(a)(3).

The district court never concluded that Callipari's part in the conspiracy was over by Monday's end.  In fact, it specifically found that the hedge was aimed at limiting his losses to a manageable amount, and not Fidelity's, in order to maintain the viability of the conspiracy.  Given how the court characterized Callipari's conduct for the entire week, its statement that the loss ended on Monday cannot reasonably be taken to mean that he was done or had withdrawn from the conspiracy at market's close on Monday.

The court stated that the theory behind the $87,000 figure did not "make sense."  It understood that the $428,000 figure represented the loss caused by Monday's trades, not the change in the market value of the options by the end of trading on Monday.  Moreover, the court's refusal to offset the loss with the profitable Monday trade indicates its view of the $428,000 figure as encompassing the entire week, and not just until the end of Monday.  We disagree with what Callipari seems to deem the district court's confusion on the issue and find no error with the court's assessment of Callipari's relevant conduct for sentencing purposes

and the loss amount attributable to Callipari by his own actions as well as the actions of Connolly, his co-conspirator.

V.   CONCLUSION

For the reasons stated above, we <u>affirm</u> Callipari's conviction and sentence.

ATTACHMENT

The following seven excerpts from Callipari's February 11, 1998 testimony before the SEC are the subject of Part III.B.2 of the opinion. They are labeled (c) through (i) in accordance with the indictment.

(c)

A. . . . There was a Monday night that I had spoken to Mr. Connolly, and he wanted to do a trade and I specifically told him that he was not to do any more trades for me because of a couple of prior problems, and that we would no longer do business together.
Q. Okay. Stop right there. On a Monday, in September?
A. Yes. That was the - I don't have a calendar. It was the 15th? 16th? Refresh my memory, do you know what day it was? Anybody have a calendar?
                    ***
A. And Mr. Connolly called me and asked to do trades after I told him that he was not to do any more trading for my account because of a prior incident.

(d)

A. . . . Then on the Monday, I told Mr. - he called, Mr. Connolly, saying that he wanted to trade. I told him, "No. You can't trade for me anymore." He said please, I says, "No. I'm going out to lunch. And then after that I'm coming back, and after that I'm taking the rest of the week off and I'll be on vacation."

(e)

Q. Is this on the Monday?
A. Yes, this was on the Monday.
Q. And you were still in your office in Rhode Island at noon?
A. Yeah, I was gone for a period of time but I came back.

-53-

Q. Okay.
A. And then T.J. [Connolly] called me, he told me he had these puts that he had done.  I told him I'm not doing it, you better cover it and tell Fidelity you have an error and tell them what you did.

(f)

Q. Between 9/20 and 9/11, did [Connolly] contact you to get orders?
A. No.  But he did on the 15th, that Monday, he tried to get an order from me and I told him no.  I remember that day - that I remember telling him on that Monday morning, I says, "No.  I'm going to lunch, I'm taking the rest of the week out, you are not - not - you are banned from trade.  You are not to do nothing."

(g)

Q. Okay.  So the next time you talked to [Connolly] after the 11th is when, the 15th?
A. I would assume, yes, that's the 15th?  That was that Monday, yes.
Q. And he calls - your previous testimony is that [Connolly] called you, he wanted to do a trade and you said no?
A. No, I told him absolutely not.
                    ***
Q. And did he - was he specific about what trade he wanted to do?  Did he have something in mind?
A. He told me he wanted to either short or get long in the market because of something.  And I told him no, there is no more trading.  I told him that there's no more O.E.X. trading.  There is nothing.  To stop.

(h)

Q. And you did not authorize any trades to JAS account with [Connolly] on the 11th or the

-54-

15th or the 16th of September, is that your testimony?

A. Yes, that's my testimony.

Q. Okay, on the 15th, did you accept any trades for the 15th? Did you say, "Okay, I'll cover these trades," at any time?

A. Did I say I would cover them?

Q. Mm-hmm.

A. No, I don't - um, he went - when I called Tony [Srock], he said, "You're not gonna like what's done." See but T.J. was lying to me. He was telling me things were covered. They weren't covered. You know, there was a lot of - nobody was really telling me what was going on at that point.

Q. On the 15th did you accept any of the trades?

A. I - not to my recollection did I accept any of those trades.

Q. What about on the 16th?

A. Not to my recollection, no.

(i)

Q. Now, these other trades that Silk [Curran] and Srock are referring to, are these the trades that, um, you're on the hook for in the Fidelity complaint?

A. That's what they're trying to blame, yeah. They're trying to blame me for those trades. It's 2 point something million dollars they're looking for.

Q. And these were trades that they claim you authorized Connolly to make for you?

A. Yes.

Q. And it's - and your position is you didn't?

A. Didn't. Did not, didn't, didn't. Swear in front of God, bibles, whatever you want, I did not authorize those trades. That was totally him. I did not authorize those trades. After the August incident, in the teens there, whatever dates they were, he was - anything he did was unauthorized.